Linda KNAPP, Plaintiff–Appellant/Cross–Appellee,

v.

EAGLE PROPERTY MANAGEMENT CORP., Defendant–Appellee,

v.

Douglas D. SMILJANIC and Sun Valley Apartments, Defendants/Third–Party Plaintiffs–Appellees/Cross–Appellants,

v.

ECONOMY PREFERRED INSURANCE COMPANY, Third Party Defendant–Cross–Appellee.

Nos. 94–1751, 94–1977.

United States Court of Appeals, Seventh Circuit.

Argued April 6, 1995.*

Decided May 17, 1995.

---

* This case was originally argued on November 3, 1994, before a panel consisting of Judges Coffey,

Pratt, the Honorable George C. Pratt of the United States Court of Appeals for the Second Circuit, sitting by designation, and Flaum. Judge

Pratt retired from the bench before a decision was reached and the case was reassigned for argument before the present panel.

Jeffrey Spitzer–Resnick (argued), Madison, WI, for Linda Knapp.

Frederick R. Croen, Charles H. Barr (argued), Lisa C. Paul, Croen & Barr, Milwaukee, WI, for Douglas D. Smiljanic, Sun Valley Apartments, Eagle Property Management Corp.

Jeffrey Spitzer–Resnick (argued), Rachel Spector, Madison, WI, for Linda Knapp.

Randy S. Parlee, Ronald G. Pezze, Jr. (argued), Peterson, Johnson & Murray, Milwaukee, WI, for Economy Preferred Ins. Co.

Before BAUER, COFFEY, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Linda Knapp brought a variety of claims against defendants, alleging that they had discriminatorily refused to rent her an apartment because of her race and her status as a recipient of federal rent assistance under the "section 8" voucher program. 42 U.S.C. § 1437f. A jury found for defendants on the race claims, but found that they had discriminated against Knapp on the basis of her section 8 vouchers. The jury awarded Knapp $95,000 in damages, which the district court reduced to $1 after finding that Knapp could only recover contractual damages under § 1437f(t). The court also awarded summary judgment for Economy Preferred Insurance Company, holding that it had no duty to defend or indemnify defendants under their multi-peril liability policy. Knapp appealed and defendants cross-appealed. We now affirm the district court's decision in all respects.

## I.

Knapp, an African–American woman with two children, receives rent assistance from the federal government in the form of a section 8 voucher. 42 U.S.C. § 1437f. Under this program, the government subsidizes a portion of a voucher recipient's rent to an owner who has volunteered to participate in the section 8 program. Section 1437f(t) prohibits participating owners from refusing to rent an apartment to a section 8 voucher holder because of her status as such. The provision does not expressly grant a private cause of action to enforce its proscription.

Knapp, who lives in Dane County, Wisconsin, sought a section 8 apartment in the spring of 1992, intending to move when her current lease expired on July 1, 1992. In April, Knapp saw an advertisement in *Start Renting* magazine stating that defendant Sun Valley, managed by defendant Eagle Property Management, both of which are owned by defendant Douglas Smiljanic (hereinafter collectively the "defendants"), had two-bedroom apartments available. Around April 8, 1992, Knapp telephoned Sun Valley and spoke with a rental agent, Sue Erickson, who informed her that Sun Valley had vacant apartments and that the complex accepted section 8 vouchers. Knapp spoke with Erickson a few days later to confirm this information and arranged a time to view an apartment. Her friend, Theresa Hayes, was also on the telephone and heard this conversation.

Knapp went to Sun Valley on April 13, 1992, and met with Erickson,[1] who once again stated that defendants accepted section 8 vouchers. Erickson showed Knapp an apartment that she liked, but Knapp did not submit an application because she did not have with her either a one month security deposit or a $150 application fee. Knapp and Hayes, who does not receive section 8 assistance, returned to Sun Valley on June 2, 1992, so Knapp could complete an application. Hayes had been accepted for an apartment at Sun Valley in May, 1992. If Sun Valley also accepted Knapp for tenancy the women planned for Hayes to care for Knapp's children, thereby enabling Knapp to obtain work and end her dependence on public assistance. When Knapp handed Erickson her completed application and fee, Erickson refused to take either and stated: "We don't accept section 8." At trial, Knapp presented memoranda from Smiljanic to Erickson stating that defendants would not sign any contracts other than their own. The program, however, requires owners to sign Housing Assistance Payment contracts with the local housing authority as well as sign an addendum containing certain provisions, unless the owner's contract already includes them.

Knapp filed a multi-claim suit in state court and defendants removed the case to district court. Knapp alleged that defen-

---

1. Knapp testified that Erickson met with her that day; defendants presented evidence that Knapp actually met with another rental agent, Connie Adornato.

dants had violated 42 U.S.C. § 1437f(t)(1)(B) by refusing to accept her application for tenancy because of her status as a section 8 voucher holder. She complained that defendants' actions had forced her to rent a less desirable apartment far from Hayes, other friends and her church, leaving Knapp socially isolated and depressed. She also asserted that she was unable to find work because of her lack of childcare. The district court held that an implied cause of action exists under § 1437f(t) to allow Knapp to enforce that provision. The jury found defendants liable and awarded Knapp $95,000 in compensatory damages. Although requested by Knapp, the court refused to give punitive or future damages instructions. In response to defendants' post-trial motion for judgment as a matter of law, the court held that Knapp could only recover contractual damages for a violation of § 1437f(t), damages which would include the costs of finding and renting a different apartment. The court based its conclusion on the theory that the potential for recovery of monetary damages beyond economic ones would deter landlords from participating in the voluntary section 8 program. The court then reduced Knapp's award to $1 because she had not proven any foreseeable economic damages.

Knapp also alleged that defendants had discriminated against her on account of her race, thereby violating the Fair Housing Act (the "Act"), 42 U.S.C. § 3601 *et seq.*, 42 U.S.C. §§ 1981 and 1982, and the Wisconsin Open Housing Act (The "Wisconsin Act"), Wis.Stat. § 101.22(6). The district court excluded expert witnesses that Knapp proffered to testify as to the disparate impact defendants' actions had on African–Americans, as well as evidence of the racial makeup of defendants' current section 8 tenants. At trial, Knapp did not testify to any overt racial comments made by defendants and the jury returned a verdict for defendants on these claims.

Third, Knapp alleged discrimination in housing on the basis of "lawful source of income," in violation of Wis.Stat. § 101.22(6). The district court granted summary judgment for defendants on this claim, holding that a section 8 voucher did not constitute

income. The court noted that a contrary determination would make the section 8 program mandatory for Wisconsin landlords, a position it rejected in the absence of clearer direction from the state legislature or courts.

Finally, defendants filed a third-party complaint against Economy Preferred Insurance Company ("Economy Preferred"), seeking a declaration that Economy Preferred had a duty to defend and indemnify defendants under their general liability insurance policy. The court granted Economy Preferred's motion for summary judgment, holding that the policy covered only "occurrences," which it defined as accidents, while Knapp's complaint alleged only intentional acts. This appeal and cross-appeal followed.

## II.

### A.

Enacted in 1987, 42 U.S.C. § 1437f(t)(1)(B) provides that:

> No owner who has entered into a contract for housing assistance payments under this section on behalf of any tenant in a multi-family housing project shall refuse—
>
> ... to lease any available dwelling unit ... to a holder of a voucher ..., a proximate cause of which is the status of such prospective tenant as a holder of such voucher.

The statute does not expressly grant voucher holders a private cause of action so we must first inquire whether the district court properly concluded that § 1437f implies such a right.

When determining whether an implied cause of action exists under a statute, we consider four factors: (1) whether the plaintiff is a member of the class for whose benefit the statute was enacted; (2) whether there is any indication of legislative intent to create or deny such a remedy; (3) whether an implied remedy is consistent with the underlying purposes of the statutory scheme; and (4) whether the cause of action is one traditionally relegated to the states so that it would be inappropriate to imply a federal remedy. *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975);

see also Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); Price v. Pierce, 823 F.2d 1114 (7th Cir.1987), cert. denied, 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 422 (1988). Although implied causes of action have fallen into disfavor, the Supreme Court has not yet forbidden them. The Court has, however, emphasized that Congressional intent is the most important element in the analysis. See Thompson v. Thompson, 484 U.S. 174, 179, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988); Spicer v. Chicago Bd. of Options Exchange, Inc., 977 F.2d 255, 258 (7th Cir.1992).

A review of the legislative history accompanying the amendment adding subsection (t) to § 1437f indicates that Congress intended voucher holders to have a cause of action to enforce its prohibition. The House Report states:

> [Section 1437f(t) ] creates an enforceable right for applicants that would prohibit owners that receive Section 8 subsidies for any other units in the project from refusing to rent a unit to a certificate or voucher holder ... because the applicant has a Section 8 certificate or voucher subsidy.

H.R. No. 122(I), 100th Cong., 1st Sess. 32 (1987), reprinted in 1987 U.S.C.C.A.N. 3317, 3348. The report continues:

> The Committee intends, and has always intended, that applicants and tenants who are adversely affected by violations of these statutory provisions should have a cause of action to enforce the statute in federal court ... Because the courts have been somewhat unreceptive to private causes of action, the Committee wishes to clarify its longstanding intention in favor of private enforcement.

Id. at 3369. Although Congress did not expressly grant a cause of action, the language above clearly displays some intention on the part of Congress for courts to recognize private suits.

Turning to the other Cort factors, § 1437f(t)'s language demonstrates that Congress enacted it for the benefit of section 8 housing assistance recipients, a class that includes Knapp. See Long v. Trans World Airlines, 913 F.2d 1262, 1265–66 (7th Cir. 1990). Implying a cause of action will fur-

ther the purpose of the statute "to assure [that] lower income households have greater access to decent and affordable housing than their limited incomes would otherwise permit." H.R. 122(I) at 53, 1987 U.S.C.C.A.N. at 3369. Voucher holders will have as much, if not more, incentive to sue owners who discriminate against them as the local housing authorities who contract with those owners and who can impose contractual penalties against discriminating owners. By enforcing the prohibition against discrimination, at least to the extent discussed below, such suits will ensure greater individual access to adequate housing. Finally, because section 8 is a federal statutory program and the right to not be discriminated against because of one's status as a voucher holder derives solely from that federal program, the right is not one traditionally relegated to the states. Thus, we conclude that an implied cause of action exists to allow recipients of section 8 assistance to enforce § 1437f(t). See Peyton v. Reynolds Assoc., 955 F.2d 247, 250 (4th Cir.1992) (discussing merits of claim against landlord by prospective section 8 tenants under § 1437f(t)); Glover v. Crestwood Lake Section 1 Holding Corp., 746 F.Supp. 301, 308–9 (S.D.N.Y.1990) (finding an implied cause of action under § 1437f(t)).

### B.

We now turn to an issue of first impression in the courts, the "analytically distinct" question of what remedies are available to redress a violation of § 1437f(t). Davis v. Passman, 442 U.S. 228, 239, 99 S.Ct. 2264, 2274, 60 L.Ed.2d 846 (1979). Traditionally, courts presume that "where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 66, 112 S.Ct. 1028, 1033, 117 L.Ed.2d 208 (1992) (quoting Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946)). "[A]bsent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." Franklin, 503 U.S. at 70–

71, 112 S.Ct. at 1035 (emphasis added). Specific remedies are not appropriate if they would "frustrat[e] the purposes of the statute involved." *Guardians Ass'n v. Civil Serv. Com'n of City of New York*, 463 U.S. 582, 595, 103 S.Ct. 3221, 3229, 77 L.Ed.2d 866 (1983) (plurality opinion). Defendants assume *arguendo* that Congress did not forbid the recovery of specific types of damages, something that Justice Scalia has noted cannot be expected when Congress has not expressly granted the cause of action. *See Franklin*, 503 U.S. at 77, 112 S.Ct. at 1038–39 (Scalia, J., concurring).

We must now determine which *available* remedies are *appropriate* to compensate plaintiffs and further the program's purpose of ensuring the availability of decent, affordable housing for voucher holders. The district court limited recoverable damages in order to ensure that owners would not be deterred from joining or remaining involved in the program. In *Franklin*, the Supreme Court rejected a similar argument that monetary damages are not available when Congress has disbursed money to the defendant participating in a voluntary program because it could always leave the program instead. The Court stated that this argument, which it had accepted in cases alleging non-intentional action, did not hold where intentional discrimination was at issue. In such a case, the participant could expect the damages to flow from its conduct and could simply avoid taking the action. *Franklin*, 503 U.S. at 74–75, 112 S.Ct. at 1037–38.

While *Franklin* might appear dispositive at first glance, we find its holding to be of limited application. The *Franklin* Court did not hold that all types of monetary damages are recoverable for all intentional conduct; rather, the Court held that such damages are not conclusively *unrecoverable*. Moreover, *Franklin* involved a claim under Title IX, 20 U.S.C. §§ 1681–1688, which prohibits educational programs receiving federal money from discriminating on the basis of sex.[2] That the Court did not specifically limit re-

covery to certain types of damages and did not foreclose the recovery of emotional distress damages is not surprising; the Court was reviewing a grant of summary judgment so the question of what constituted appropriate monetary damages was not at issue below. The Court also stated that "Congress surely did not intend for federal monies to be expended to support the intentional actions it sought by statute to proscribe." *Franklin*, 503 U.S. at 75, 112 S.Ct. at 1037. Section 8 owners, unlike Title IX education programs, do not receive a set amount of money regardless of the extent of their involvement in the program but instead receive assistance only for their section 8 tenants. Owners do not expend federal money while discriminating against section 8 applicants; instead, they limit the amount of assistance they receive. Simply put, the Court's statement does not dictate the conclusion that *all* monetary damages are recoverable in every implied cause of action. Thus, *Franklin* does not answer the question of what damages may be *appropriately* awarded under § 1437f(t).

■ In enacting § 1437f(t), Congress intended to increase the availability of low-income housing. To do so, the section 8 program must be attractive to owners and must ensure that once they are a part of the program they fully participate by continuing to accept voucher holders as tenants. Allowing the recovery of potentially unlimited compensatory damages undoubtedly would deter owners from participating in the section 8 program and would be counterproductive to congressional goals. Knapp nonetheless contends that because § 1437f(t) uses the word "discrimination," remedies available under civil rights statutes must also be recoverable under that provision. Civil rights and other anti-discrimination statutes, however, prohibit conduct we find "socially evil" and ban in circumstances other than housing. *See, e.g.*, 42 U.S.C. § 2000e *et seq.* ("Title VII") (prohibiting discrimination in employment on the basis of race, color, religion, sex, or national

**2.** The relevant section states, in part:
No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program

or activity receiving Federal financial assistance . . .
20 U.S.C. § 1681. The Court had previously found an implied cause of action under the statute. *Cannon*, 441 U.S. at 709, 99 S.Ct. at 1964.

origin); 42 U.S.C. § 1981 (prohibiting racial discrimination in, among other things, the formation and enforcement of contracts); *see also University of Pennsylvania v. EEOC*, 493 U.S. 182, 193, 110 S.Ct. 577, 584, 107 L.Ed.2d 571 (1990) ("Few would deny that ferreting out ... invidious discrimination is a great, if not compelling, governmental interest."). We presume that such conduct can lead to emotional distress and require plaintiffs to prove only their actual damages caused by the discrimination. *United States v. Balistrieri*, 981 F.2d 916, 931 (7th Cir. 1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 58, 126 L.Ed.2d 28 (1993); *Seaton v. Sky Realty*, 491 F.2d 634 (7th Cir.1974). On the other hand, § 1437f(t) proscribes conduct Congress had not prohibited in any context other than housing, and then only when done by a participating owner. Indeed, although Knapp stated that she only looked at Sun Valley, her friend testified that they had visited several other apartment complexes to inquire whether they accepted section 8 assistance. Almost all of these owners responded in the negative and their behavior does not seem objectionable. The same conduct does not become so unacceptable as to allow a presumption that emotional distress will result simply because it is done by a participating owner. Consequently, owners participating in the section 8 program should not be held liable for alleged emotional distress damages absent the safeguards of state common law torts such as the intentional infliction of emotional distress, which requires proof of the outrageousness of the relevant conduct. *Bowen v. Lumbermens Mutual Casualty Co.*, 183 Wis.2d 627, 517 N.W.2d 432 (1994) (discussing elements of Wisconsin torts of intentional and negligent infliction of emotional distress). Because voucher holders can always bring a state law tort claim against offending landlords, we cannot infer that Congress intended to federalize these state torts or turn merely rude behavior into a windfall for section 8 recipients by not requiring adequate safeguards. The district court properly held that emotional distress damages are not recoverable for violations of § 1437f(t).

█ The district court held that Knapp could only recover contractual and equitable remedies. This limitation is sensible because an owner's duty to not discriminate arises from the contract he signs with the local housing authority. Moreover, section 8 is an economic program and contractual damages encompass foreseeable economic damages. *See* 3 E. ALLEN FARNSWORTH, FARNSWORTH ON CONTRACTS §§ 12.14, 12.17 (1990); *see also Harsch v. Eisenberg*, 956 F.2d 651 (7th Cir.) (damages for breach of ERISA, a statutory economic program, expressly limited by Congress to contractual damages), *cert. denied*, —— U.S. ——, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992).

Equitable remedies such as injunctions are also available to redress the effects of section 8 discrimination. Knapp contends that an injunction is inadequate because she logically has no desire to rent from an owner that discriminated against her.[3] While that may be the case for Knapp, we do not assume all voucher holders will feel the same way— indeed, we have stated that reinstatement is the *preferred* remedy for invidious employment discrimination. *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1370 (7th Cir. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1270, 122 L.Ed.2d 665 (1993). Finally, the Dane County Housing Authority has available a range of contractual penalties, such as terminating or reducing housing assistance payments, that it can invoke in order to ensure owner compliance with § 1437f(t). We believe that this possibility, in addition to economic and equitable remedies, will adequately compensate for violations of § 1437f(t) while not deterring owners from participating in the program, as emotional distress and other compensatory damages might. Therefore, we affirm the district court's decision limiting Knapp's award to $1 nominal damages.

---

**3.** Knapp also asserts that an injunction would be inadequate because she has signed a lease for another apartment. We assume that a court could order a participating owner to rent to a voucher holder at a future date.

### C.

Knapp also challenges several of the district court's evidentiary rulings which we review for abuse of discretion. *McGeshick v. Choucair,* 9 F.3d 1229, 1236 (7th Cir. 1993). We ask "not whether we would have ruled the same way but rather whether any reasonable person would have agreed with the trial court." *Holmes v. Elgin, Joliet & Eastern Railway Co.,* 18 F.3d 1393, 1397 (7th Cir.1994). Even if the court erred, we will not reverse if that error was harmless. *Id.*

First, Knapp asserts that the court should not have excluded evidence that all of Sun Valley's current section 8 tenants are white. Knapp did not, however, present any evidence regarding the race of section 8 voucher holders that had recently applied for and been denied tenancy. Without such comparative figures and in light of the introduction of evidence showing defendants' non-section 8 minority tenants, Knapp's evidence was not particularly probative of anything. *See, Kier v. Commercial Union Ins. Cos.,* 808 F.2d 1254, 1258 (7th Cir.), *cert. denied,* 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 528 (1987); *see also Futrell v. J.I. Case,* 38 F.3d 342, 348 (7th Cir.1994); *Smith v. General Scanning, Inc.,* 876 F.2d 1315, 1321 (7th Cir.1989); *Simpson v. Midland–Ross Corp.,* 823 F.2d 937, 943 (6th Cir.1987). Thus the court did not abuse its discretion in excluding this evidence.

Knapp next contends that the district court erroneously excluded her expert witnesses, who would have testified that although whites make up 80% of Dane County's section 8 voucher holders, a much higher percentage of the county's total African–American population receives the vouchers. Knapp sought to introduce this information to show that the defendants' refusal to accept any new section 8 tenants disproportionately affected African–Americans, thereby violating the Act. While the Supreme Court has not yet determined whether practices that produce disparate effects violate the Act, *Huntington v. NAACP,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988), this court has previously applied disparate impact analysis to a claim under the Act. *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir. 1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978). In *Arlington Heights,* however, we "refuse[d] to conclude that every action which produces discriminatory effects is illegal.... Rather, the courts must use their discretion in deciding whether, given the particular circumstances of each case, relief should be granted under the statute." 558 F.2d at 1290. Since then, this court has recognized that disparate impact analysis is not appropriate in certain contexts. *See NAACP v. American Family Mutual Ins. Co.,* 978 F.2d 287, 290 (7th Cir.1992) (claim alleging failure to insure in certain areas violated the Act not conducive to disparate impact analysis), *cert. denied,* —— U.S. ——, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993); *Village of Bellwood v. Dwivedi,* 895 F.2d 1521, 1533 (7th Cir.1990) ("Some practices lend themselves to disparate impact method, others do not.").

Owner participation in the section 8 program is voluntary and non-participating owners routinely reject section 8 voucher holders. We assume that their non-participation constitutes a legitimate reason for their refusal to accept section 8 tenants and that we therefore cannot hold them liable for racial discrimination under the disparate impact theory. Yet, as the district court noted, no principled way exists to distinguish these owners from those who have agreed to accept section 8 tenants and not to discriminate against them on that basis. The actions of both non-participating and participating owners have the same impact on minorities and to hold only the latter liable for racial discrimination for that conduct would deter them from joining or remaining involved in the program. Furthermore, our reasons for limiting recoverable damages under § 1437f(t) support our refusal to apply disparate impact analysis to claims based on conduct prohibited by that section. *But see Bronson v. Crestwood Lake Section 1 Holding Corp.,* 724 F.Supp. 148, 153–55 (S.D.N.Y. 1989) (granting a preliminary injunction because plaintiffs, African–American section 8 voucher recipients, had shown a probability of success on the merits of their claim that defendant's refusal to accept section 8 vouch-

ers and its three-times-rent income requirement violated the Act by disproportionately affecting minorities). The district court therefore did not abuse its discretion in excluding the expert testimony.[4] A review of the record indicates that the district court did not abuse its discretion in making the other evidentiary rulings challenged by Knapp.

■ Third, the district court refused to instruct the jury on either punitive or future and consequential damages, rulings that Knapp argues were erroneous. We review the court's determination that the facts of this case did not justify punitive damages *de novo. Jackson v. Bunge Corp.,* 40 F.3d 239, 246 (7th Cir.1994). Punitive damages, like all other damages, must be an *appropriate* remedy under § 1437f(t) to warrant an instruction. For the same reason that we held compensatory damages not recoverable under § 1437f(t)—the probability of deterring owner participation in the program and the differences between discrimination under § 1437f(t) and traditional civil rights laws— we conclude that punitive damages are likewise not an appropriate remedy for violations of that provision. *See* Farnsworth, *supra,* § 12.8 (punitive damages usually not recoverable for a breach of contract). The court did not abuse its discretion in failing to give a punitive damages instruction for Knapp's section 8 claim. Moreover, any error in refusing a punitive damages instruction for Knapp's racial discrimination claims is harmless given the jury's verdict for defendants on the underlying issues.

■ As to other damages, Knapp contends that the district court erred in refusing an instruction on future and consequential damages and in reducing her award when the verdict form did not delineate amounts for specific items of damages. Knapp testified that defendants' actions forced her to rent an apartment far from Hayes, which resulted in Hayes being unable to babysit Knapp's children, thereby making Knapp unable to accept a job. Knapp stated that she was very anxious to end her receipt of public assis-

tance and would have accepted any job. Knapp attempted to stipulate to a maximum recovery of lost-wages equal to 40 hours of work per week at $4.00 per hour for the sixteen months between defendants' actions and the trial. She had not, however, presented any evidence to support such a recovery, including no evidence about what jobs she may have been able to obtain, the hours and pay she could have received, or the amount of time Hayes, who had a full-time job herself, could actually have watched Knapp's children. In addition, Knapp testified that the apartment she rented was "raggedy," and did not have security or air conditioning. She introduced, however, only minimal evidence about the condition of a Sun Valley apartment and offered no proof as to the rent differential.

■ "[I]t is inevitable and proper that on average the threshold for proving damages will be lower in the small case than in the large." *Partington v. Broyhill Furniture Industries, Inc.,* 999 F.2d 269, 273 (7th Cir. 1993). A low hurdle still requires some evidence, however, because "damages, like every other contested element of plaintiff's case, must be proved in order to be recovered; a plaintiff who wants substantial damages can't just ask for them." *Ustrak v. Fairman,* 781 F.2d 573, 579 (7th Cir.), *cert. denied,* 479 U.S. 824, 107 S.Ct. 95, 93 L.Ed.2d 47 (1986); *see also Taliferro v. Augle,* 757 F.2d 157, 162 (7th Cir.1985) ("A plaintiff is not permitted to throw himself on the generosity of the jury. If he wants damages, he must prove them."). Knapp failed to meet this burden regarding her alleged lost-wages and difference in apartment values. Moreover, she could not recover the other damages, lost childcare and the cost of future health insurance, to which she feels entitled. The district court noted that Knapp had not expended any money on childcare—she took care of her own children, something not compensable except as it may have required her to forgo a job, in which case lost-wages, which Knapp did not prove, would be the appropriate measure of dam-

4. On appeal, Knapp does not challenge the exclusion of this evidence as it relates to her race-based claims under 42 U.S.C. §§ 1981 and 1982 and the Wisconsin Act, so we do not discuss the propriety of the court's decision under those statutes.

ages. As to future medical insurance costs, we do not see this as a compensable loss. If defendants had accepted Knapp for tenancy and she had found a job, she would have lost her medical assistance benefits and been forced to pay for insurance for her family. But under that scenario, Knapp would have had to bear these costs herself. Defendants cannot be forced to put her in a better position than she would have been absent their conduct. *See* Farnsworth, *supra,* § 12.1 (contract damages are designed to put "the injured party in as good a position as that party would have been in had ... there been no breach.").[5]

#### D.

■■■ Knapp also contends that the district court erred in awarding summary judgment for defendants on her claim under the Wisconsin Open Housing Act. Wis.Stat. § 101.22(6). That statute prohibits landlords from discriminating in housing on the basis of "lawful source of income," which the Wisconsin Administrative Code defines as:

includ[ing] but ... not limited to lawful compensation or lawful remuneration in exchange for goods or services provided, profit from financial investments, any negotiable draft, coupon, or voucher representing monetary value such as food stamps, social security, public assistance or unemployment compensation benefits.

Wis.Admin.Code § IND 89.01(8).

The district court held that section 8 vouchers are more analogous to subsidies than income. The court relied on a dictionary definition of income, however, and Wisconsin has enlarged the meaning of that term in § 101.22 and IND § 89.01(8). Even given the state's broader definition, we reach the same conclusion as the district court.

Knapp receives a section 8 voucher, but that assistance does not clearly equate to the other forms of aid specified in the statute. Of the categories listed in IND § 89.01(8), the voucher is most analogous to food stamps. Unlike food stamps, however, section 8 vouchers do not have a monetary value independent of the voucher holder and the apartment sought. *See* 42 U.S.C. §§ 1437a(a), 1437f. In addition, unlike other forms of support, the local housing authority makes payments directly to the owner pursuant to a contract between those parties, rather than to the voucher holder. *Holbrook v. Pitt,* 748 F.2d 1168, 1171 (7th Cir.1984). While this form of assistance could arguably be included within the Wisconsin Act, we decline to ascribe such an intent to the state legislature because of the potential problems in doing so.

We can envision three results from reading the statute to encompass section 8 vouchers. First, all owners could be held liable for rejections on the basis of the vouchers. It seems questionable, however, to allow a state to make a voluntary federal program mandatory. *But see Attorney General v. Brown,* 400 Mass. 826, 511 N.E.2d 1103, 1106 (1987) (state law banning housing discrimination on the basis of housing subsidies, including rental assistance, making the acceptance of section 8 vouchers essentially mandatory, not preempted by § 1437f). Second, the state could read income to include these vouchers, but could accept non-participation in the program as a legitimate reason for the owner's action, thereby relieving him of liability in the same way that legitimate nondiscriminatory reasons dissolve a *prima facie* case under Title VII. *See, e.g., Hughes v. Brown,* 20 F.3d 745, 746–47 (7th Cir.1994); *Attorney General v. Brown,* 400 Mass. 826, 511 N.E.2d at 1109 (recognizing that legitimate business reasons would preclude liability); *Bronson,* 724 F.Supp. at 155 ("[T]he burden is upon the defendant to show that the challenged practices serve legitimate and genuine business goals."). Third, the statute could be read to encompass income only when offered by a voucher holder to an owner participating in the program, because only such owners could receive housing subsidies without

---

5. Knapp did not know that she would have to prove both her damages and that they were foreseeable to defendants. If she had introduced sufficient evidence of her damages we would not presume that defendants could not, as a matter of law, have foreseen them and would have remanded for a new trial on damages. Knapp's failure to meet her initial burden of proof prevents us from doing so.

being forced to enter a voluntary program. Under the last two scenarios, the Wisconsin Act and its full panoply of remedies[6] would apply only to participating owners. This would certainly interfere with the purpose of the program since that same purpose compelled us to limit recoverable damages under the federal statute. These apparent problems, together with the absence of language clearly including such assistance, lead us to affirm the district court's conclusion that section 8 vouchers do not constitute a lawful source of income.

### III.

#### A.

■ Defendants' cross-appeal contends that no reasonable jury could have found that defendants discriminated against Knapp because of her status as a section 8 voucher holder. The district court denied defendants' motion for judgment as a matter of law, FED.R.CIV.P. 50(b), a decision which we review *de novo*. *Downes v. Volkswagen of America, Inc.*, 41 F.3d 1132, 1139 (7th Cir. 1994). We view all evidence and reasonable inferences in the light most favorable to Knapp, the prevailing party, and will uphold the verdict if it is supported by substantial evidence. *Id.*

Defendants base their argument on Knapp's testimony: She stated that she spoke with a friend the day Erickson refused to accept her application but mentioned nothing about her section 8 assistance. In addition, Knapp testified that she told her therapist that defendants turned down her application because of her race, once again failing to mention her section 8 status as a reason for their conduct. Thus, defendants contend, Knapp herself believed that she had been discriminated against because of her race, and the jury could not conclude to the contrary. Knapp also testified, however, that

Erickson had refused to accept her application, and Hayes testified that Erickson had stated that defendants did not accept section 8.[7] Memoranda from Smiljanic to Erickson indicated that defendants would not sign any contracts other than their own, making it impossible to accept any more section 8 tenants, yet defendants had failed to take any steps toward ending their participation in the program. Additionally, defendants admitted that since Knapp had attempted to apply until the time of trial, they had accepted applications from section 8 voucher holders but had rejected all of them. The entirety of the evidence, when read in Knapp's favor, sufficiently supports the jury's verdict that defendants did not accept Knapp's application because of her status as a section 8 voucher holder.

#### B.

■ Defendants also appeal the court's grant of summary judgment for Economy Preferred, their general liability insurer. Economy contends that defendants' conduct was not an occurrence covered under the policy and that Knapp did not allege any injury covered by the policy. Thus, Economy had a duty neither to defend nor to indemnify defendants. The interpretation of an insurance contract is a question of law that we review *de novo*. *Lund v. American Motorists Ins. Co.*, 797 F.2d 544, 546 (7th Cir.1986).

To determine whether Economy had to defend this action we must look to the four corners of Knapp's complaint and decide whether it " 'allege[s] facts which, if proven, would give rise to liability covered under the terms and conditions of the policy.' " *Scottish Guarantee Ins. Co., Ltd. v. Dwyer*, 19 F.3d 307, 309 (7th Cir.1994) (quoting *Sola Basic Indus., Inc. v. U.S. Fidelity & Guar.*

---

6. The Wisconsin Act allows a plaintiff to recover "injunctive relief, for damages, including punitive damages, and in the case of a prevailing plaintiff, for court costs and reasonable attorney fees." Wis.Stat. § 101.22(6m)(a).

7. Defendants also contend that Hayes only believed they had discriminated on the basis of race because she said, "You guys treat all black peo-

ple like that" after Erickson refused to accept Knapp's application and made a similar comment when withdrawing her own application. We note that Hayes may have omitted any reference to section 8 assistance simply because she did not receive it. Her comments do not require us to hold that no reasonable jury could have inferred section 8 discrimination.

Co., 90 Wis.2d 641, 280 N.W.2d 211, 213 (1979)). We do not inquire into the relative merits of the claims. *See School Dist. of Shorewood v. Wausau Ins. Co.,* 170 Wis.2d 347, 488 N.W.2d 82, 87–88 (1992). The policy itself states that Economy Preferred will "have the right and duty to defend any 'suit' *seeking* [covered] damages." (emphasis added).

Wisconsin courts construe insurance policies as they do ordinary contracts. *Kremers–Urban Co. v. American Employers Insurance Co.,* 119 Wis.2d 722, 351 N.W.2d 156, 163 (1984). "The objective in interpreting and construing a contract is to ascertain and carry out the true intention of the parties." *Id.* Specifically, insurance contracts are construed to mean "what a reasonable person in the position of the insured would have understood the words to mean." *Id.* Ambiguities must be construed in favor of the insured. *Sola Basic,* 90 Wis.2d 641, 280 N.W.2d at 214. "Words or phrases are ambiguous if they are fairly susceptible to more than one construction." *Kremers–Urban,* 119 Wis.2d 722, 351 N.W.2d at 163. Where a policy is not ambiguous, we simply apply the plain meaning of its terms. *Id.*

The policy at issue covers "bodily injury" and "property damage" caused by an "occurrence," which the policy defines as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." An exclusion clause states that the policy does not cover bodily injury or property damage "expected or intended from the standpoint of the insured." The district court held that the policy covered only accidents, not intentional acts resulting in unintended or unexpected damage as defendants contended, while Knapp's complaint alleged only intentional conduct. We need not review this decision because we conclude that Knapp did not allege any covered damages.

The policy at issue covers only "property damage" and "bodily injury," which it defines as "bodily injury, sickness or disease." Economy Preferred contends that only physical ailments fall within the term bodily injury, while depression and other emotional damages are "personal injuries." The Wis-

consin cases cited by Economy Preferred, however, either do not include the same definition of bodily injury because they exclude sickness and disease, *Richie v. American Family Mutual Ins. Co.,* 140 Wis.2d 51, 409 N.W.2d 146, 147–48 (Ct.App.Wis.), *review denied,* 140 Wis.2d 873, 416 N.W.2d 66 (1987), cover personal injury, *Eau Claire County v. Employers Ins. of Wausau,* 146 Wis.2d 101, 430 N.W.2d 579, 583 (Ct.App.Wis.1988), or were decided on other grounds. Therefore, we conclude that Wisconsin courts have not expressly held that emotional distress damages are only covered by policies including the term "personal injury."

Defendants assert that *Lavanant v. General Accident Ins. Co. of America,* 79 N.Y.2d 623, 584 N.Y.S.2d 744, 595 N.E.2d 819 (1992), is the most analogous case and that we should adopt its reasoning. Faced with the same definition of bodily injury as at issue here, the *Lavanant* court held that the policy covered depression. The court stated that the terms sickness and disease enlarged the term bodily injury and "to the average reader may include mental as well as physical sickness and disease." *Id.* 584 N.Y.S.2d at 747, 595 N.E.2d at 822. The court declined to "rewrite the contract to add 'bodily sickness' and 'bodily disease,' [because the insurer] could itself have specified such limitations in drafting its policy, but it did not do so." *Id.*

Contrary to *Lavanant,* we believe that the most natural reading of "bodily injury, sickness, or disease" indicates that "bodily" modifies all three terms, *see E–Z Loader Boat Trailers, Inc. v. Travelers Indemnity Co.,* 106 Wash.2d 901, 908; 726 P.2d 439, 443 (1986) (*en banc* ), thereby covering only injuries with some physical component. The term is therefore not ambiguous. This meaning accords with that given to the same definition of bodily injury by the majority of courts. *See, e.g., SL Industries, Inc. v. American Motorists Ins. Co.,* 128 N.J. 188, 607 A.2d 1266, 1274 (1992) (collecting cases); *Voorhees v. Preferred Mutual Ins. Co.,* 128 N.J. 165, 607 A.2d 1255, 1260–61 (1992) (collecting cases); *Mellow v. Medical Malpractice Joint Underwriting Assoc.,* 567 A.2d 367, 368 (R.I.1989). We need not decide today

whether Wisconsin courts would read "bodily injury" to cover not only purely physical injury but also emotional damages accompanied by physical injury. Knapp alleged only that defendants' conduct resulted in her becoming socially isolated and depressed. She did not complain of any physical problems and we will not take judicial notice, as defendants requested at oral argument, that depression is often manifested physically. We determine the insurer's duty to defend by the face of the complaint, which here does not allege any bodily injury. Knapp alleged other damages such as being forced to rent an inferior apartment far from her church and friends, but these items clearly do not fall either within the term bodily injury or property damage. *See Qualman v. Bruckmoser*, 163 Wis.2d 361, 471 N.W.2d 282, 285 (Ct.App. Wis.1991) (pecuniary losses not covered as bodily injury or property damage). The district court correctly granted summary judgment for Economy Preferred.

For the foregoing reasons, we affirm the decision of the district court.

AFFIRMED.