725 A.2d 1104

FRANKLIN TOWER ONE, L.L.C., AS SUCCESSOR IN INTEREST
TO SAVA HOLDING CORPORATION, PLAINTIFF-APPELLANT,
v. N.M., DEFENDANT-RESPONDENT.

Argued October 26, 1998—Decided March 23, 1999.

*Tara P. D'Amato* argued the cause for appellant.

*John N. Ukegbu* argued the cause for respondent (*Timothy K. Madden,* Director, Hudson County Legal Services Corporation).

*Joseph Harris David* argued the cause for *amicus curiae* Legal Services of New Jersey (*Melville D. Miller Jr.,* President, attorney; *Mr. Miller* and *Mr. David,* on the brief).

*Cheryl R. Clarke,* Deputy Attorney General, argued the cause for *amicus curiae* State of New Jersey, Department of Community Affairs (*Peter Verniero,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of

counsel; *Ms. Clarke* and *Keith A. Costill,* Deputy Attorney General, on the brief).

*David L. Harris* submitted a brief on behalf of *amici curiae* National Housing Law Project, The Judge David L. Bazelon Center on Mental Health Law, The Connecticut Fair Housing Center, Connecticut Legal Services, Inc. and The St. Paul Tenants' Union (*Lowenstein Sandler,* attorneys).

*Norman A. Feinstein* submitted a brief on behalf of *amici curiae* National Multi Housing Council, National Apartment Association, National Leased Housing Association, National Association of Home Builders, New Jersey Apartment Association, Manufactured Housing Institute and Institute of Real Estate Management (*Feinstein, Raiss & Klein,* attorneys; *Mr. Feinstein* and *Charles L. Edson,* a member of the Missouri bar and *Harry J. Kelly,* a member of the Maryland bar, on the brief).

*Joan E. Pransky* relied on brief submitted by Legal Services of New Jersey on behalf of *amicus curiae* New Jersey Tenants Organization.

The opinion of the Court was delivered by

STEIN, J.

In 1981, as part of "[a]n Act making it unlawful to refuse to rent to persons with children under certain circumstances and to refuse to rent to a person because of objections to the person's source of income," the New Jersey Legislature enacted *N.J.S.A.* 2A:42–100, which provides, in pertinent part:

> No person, firm or corporation or any agent, officer or employee thereof shall refuse to rent or lease any house or apartment to another person because of the source of any lawful income received by the person or the source of any lawful rent payment to be paid for the house or apartment.

The purpose of the act, in part, was to "prohibit[ ] a landlord from refusing to rent to a person merely because of objections to the source of the person's lawful income." *Assembly Commerce, Industry and Professions Committee, Statement to A. 994* (May 1, 1980). In a press release accompanying the signing of the legislation, Governor Byrne stated that its purpose was "to protect from

housing discrimination welfare recipients, spouses dependent on alimony and child support payments and tenants receiving governmental rental assistance." Office of the Governor, *News Release* at 1 (Dec. 9, 1981).

The issue presented in this appeal is whether *N.J.S.A.* 2A:42–100 prohibits a landlord that has never participated in the federal Section 8 rental assistance program, 42 *U.S.C.A.* § 1437f, from refusing to accept a Section 8 voucher from one of the landlord's existing tenants who becomes eligible for Section 8 assistance during the course of her tenancy. Specifically, we must decide whether *N.J.S.A.* 2A:42–100 encompasses Section 8 payments and, if so, whether it is preempted by the federal legislation.

The trial court found that the state statute did not encompass Section 8 vouchers and that, even if it did, it is preempted by the federal statute. The Appellate Division reversed, holding that *N.J.S.A.* 2A:42–100 requires property owners to accept Section 8 vouchers, and that there is no preemption. 304 *N.J.Super.* 586, 589–90, 701 *A.*2d 739 (1997). We granted the property owner's petition for certification. 152 *N.J.* 364, 704 *A.*2d 1299 (1998).

I

The essential facts are not in dispute. At the time this action was commenced, Sava Holding Corporation (Sava) owned an eighteen-unit residential building located at 211 64th Street, West New York, New Jersey. All tenants in the building were subject to oral month-to-month tenancies. N.M., a sixty-five-year-old widow who was unable to work, had been a tenant in the building since 1991. Her sole source of income was a monthly grant of Social Security in the amount of $521.80. N.M.'s monthly rent was $450, but Sava agreed to reduce it to $425 per month. The building in which N.M. resided was subject to the West New York Rent Control Ordinance.

On April 22, 1996, the West New York Housing Authority issued N.M. a Section 8 rental voucher, an authorization issued pursuant to the federal Section 8 housing program that can be

redeemed by a landlord for a portion of a tenant's monthly rent. N.M. had applied for Section 8 assistance when she first moved into the building, but she was not eligible at that time. The voucher provided that the Housing Authority would agree to make monthly payments to Sava to assist N.M. in paying the rent. On April 24, 1996, N.M. tendered the Section 8 voucher and the requisite documents to Sava to be applied to the following month's rent. Sava refused to accept the voucher or to execute the documents because it did not want to become entangled with the "bureaucracy" of the Section 8 program. Sava had never participated in the Section 8 rental assistance program or in any other federal or state rental assistance program.

In May 1996, Sava filed a summons and complaint in tenancy against N.M. alleging non-payment of rent, pursuant to *N.J.S.A.* 2A:18–61.1(a). The trial court held that Sava was not required to accept the Section 8 voucher. The court concluded that *N.J.S.A.* 2A:42–100 prohibits discrimination by landlords against people who have children or who are "on Public Assistance, or receive[ ] alimony, or child support," but that the statute does not prohibit landlords from refusing to accept Section 8 rental vouchers. The court also held that the state statute, because it interfered with the voluntary nature of the federal Section 8 program, was preempted under the Supremacy Clause.

A judgment of possession was entered, and N.M. was ordered to pay the total rent due. N.M. filed a notice of appeal. In March 1997, Sava sold the building to Franklin Tower One, L.L.C. (Franklin Tower), the successor in interest to Sava and the named party in this appeal.

The Appellate Division reversed, holding that *N.J.S.A.* 2A:42–100 prohibits landlords from refusing to accept Section 8 vouchers. 304 *N.J.Super.* at 589–90, 701 *A.2d* 739. The court relied on *M.T. v. Kentwood Construction Co.*, 278 *N.J.Super.* 346, 350, 651 *A.2d* 101 (App.Div.1994), which "recognized that Section 8 voucher payments were encompassed within both the letter and spirit of *N.J.S.A.* 2A:42–100." 304 *N.J.Super.* at 589, 701 *A.2d* 739. The

Appellate Division found further support for its holding in New Jersey's "strong public policy ... to secure affordable housing for low-income persons." *Id.* at 591, 701 *A.*2d 739. The court also held that, because the federal and the state statutes advance the same goal of protecting low-income tenants, there is no conflict between the two statutes and therefore the state statute is not preempted. *Id.* at 592, 701 *A.*2d 739.

## II

### A

The Section 8 housing assistance program was established by the Housing and Community Development Act of 1974, codified at 42 *U.S.C.A.* § 1437f, which amended the United States Housing Act of 1937. The Section 8 program was enacted "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 *U.S.C.A.* § 1437f(a). To that end, Section 8 authorizes the Secretary of the Department of Housing and Urban Development (HUD) to enter into annual contribution contracts with local public housing authorities so that they may make assistance payments to owners of existing dwelling units. 42 *U.S.C.A.* § 1437f(b).

When a tenant is deemed eligible for Section 8 assistance, the housing authority issues a voucher or certificate. 24 *C.F.R.* § 982.302(a).[1] The tenant must then find an apartment and an owner "willing to lease the unit under the [Section 8] program." 24 *C.F.R.* § 982.302(b). Once such a unit is located, the tenant executes a lease with the owner. 24 *C.F.R.* § 982.305. Generally, the tenant pays no more than thirty percent of her household income toward the monthly rent. 42 *U.S.C.A.*

---

[1] N.M. received a Section 8 voucher. For purposes of this case, there are no significant differences between the issuance of a certificate, 42 *U.S.C.A.* § 1437f(d), and the issuance of a voucher, 42 *U.S.C.A.* § 1437f(o). The certificate and voucher programs were recently merged by Section 545 of the Quality Housing and Work Responsibility Act of 1998. H.R. 4194.

§ 1437f(o)(11)(B)(ii). The housing authority enters into a separate Housing Assistance Payment (HAP) contract with the owner, pursuant to which the housing authority agrees to pay the balance of the fair market rent as established by HUD. 24 *C.F.R.* § 982.1.

The HAP contract requires the property owner to maintain the unit in accordance with HUD housing quality standards (HQSs), contained at 24 *C.F.R.* § 982.401. The HQSs set forth criteria for, among other things, the unit's interior air quality, lead-based paint content, sanitary facilities, and water supply. *Ibid.* Section 8 units are inspected annually to assure that the HQSs are being satisfied. 24 *C.F.R.* § 982.405.

Some of the requirements of the Section 8 program were recently altered or eliminated by Section 545 of the Quality Housing and Work Responsibility Act of 1998, H.R. 4194 (Section 545). For example, prior to the enactment of Section 545, the term of Section 8 leases could not be less than one year. 42 *U.S.C.A.* § 1437f(d)(B)(i). Now, a local housing authority may approve a shorter lease term. § 545(a). Although Section 8 landlords were previously required to use a form of lease promulgated by HUD, the new legislation permits a landlord to use the same lease form that its non-Section 8 tenants execute. *Ibid.*

The federal legislation and regulations explicitly contemplate that the states will work with the federal government to implement the Section 8 program. *See, e.g.,* 42 *U.S.C.A.* § 1437 ("It is the policy of the United States ... to vest in local public housing agencies the maximum amount of responsibility in the administration of their housing programs."); 24 *C.F.R.* § 982.1 (providing that voucher and certificate programs are administered by state or local housing agencies); *see also Kargman v. Sullivan,* 552 *F.*2d 2, 11 (1st Cir.1977) (finding federal housing legislation to be "consciously interdependent with the substructure of local law relating to housing") (footnote omitted). In addition, a number of the Section 8 regulations defer to state or local law. *See, e.g.,* 24 *C.F.R.* § 982.308 (providing that tenant's legal capacity to enter into lease is determined by state or local law); 24 *C.F.R.* § 982.313

(providing that landlord's use of security deposit at end of tenancy is subject to state or local law); 24 *C.F.R.* § 982.4 (providing that domicile of head of household is determined by state or local law); 24 *C.F.R.* § 982.451 (providing that housing authority that fails to make timely payment to landlord is subject to late fees in accordance with state or local law). The regulations also provide that landlords may be entitled to less than the fair market rent as determined by HUD if the unit is located in a municipality with a rent control ordinance. 24 *C.F.R.* § 982.511.

The Section 8 program provides that "the selection of tenants shall be the function of the owner." 42 *U.S.C.A.* § 1437f(d)(1)(A); *see also* 24 *C.F.R.* § 982.452(b)(1) (making landlord responsible for "selecting a certificate-holder or voucher-holder to lease the unit, and deciding if the family is suitable for tenancy of the unit"). Based on that language, several courts have found that the federal scheme does not require landlords to participate in the Section 8 program. See *Salute v. Stratford Greens Garden Apartments,* 136 *F.*3d 293, 296 (2d Cir.1998) ("Participation by landlords is voluntary; they lawfully may refuse to accept applications from Section 8 beneficiaries."); *Knapp v. Eagle Property Management Corp.,* 54 *F.*3d 1272, 1282 (7th Cir.1995) (stating that Section 8 is "voluntary federal program"). *But cf. Attorney General v. Brown,* 400 *Mass.* 826, 511 *N.E.*2d 1103, 1106 (1987) ("It does not follow that, merely because Congress provided for voluntary participation, the States are precluded from mandating participation...."); *Commission on Human Rights v. Sullivan Assoc.,* 1998 WL 395196 at * 9 (Conn.Super.Ct. June 8, 1998) ("[N]othing in the federal [Section 8] program prevents a state from mandating participation.").

In *Hill v. Group Three Housing Development Corp.,* 799 *F.*2d 385 (1986), the Eighth Circuit discussed the voluntary nature of the Section 8 program. The court found that by leaving management decisions, including the selection of tenants, to the landlord, Congress intended to encourage participation in the program. *Id.* at 388. The court referred to a handbook distributed to Section 8

landlords in which HUD listed the following permitted tenant screening criteria: "(1) demonstrated ability to pay rent on time; (2) comments from former landlords; (3) poor credit references; (4) housekeeping habits." *Id.* at 389. The handbook also requires Section 8 landlords to "comply with all federal, state, and local fair housing and civil rights laws," and prohibits discrimination against families receiving welfare. *Id.* at 389 & n. 5.

Similarly, the federal regulations indicate that the selection of tenants by landlords is meant to permit landlords to evaluate the fitness of Section 8 recipients as they would any other prospective tenant. Owners are encouraged to screen potential tenants on the basis of their tenancy histories, taking into account such factors as housekeeping habits and respect for the rights of other tenants. 24 *C.F.R.* § 982.307.

In 1987, Congress amended Section 8 to include a prohibition against discrimination in the selection of Section 8 tenants. 42 *U.S.C.A.* § 1437f(t). The so-called "take-one, take-all" provision made it unlawful for an owner participating in the Section 8 program to reject a prospective tenant because of that tenant's status as a Section 8 recipient. Significantly, the "take-one, take-all" provision did not require an owner to accept Section 8 tenants if that owner had never participated in the Section 8 program. "In enacting [the 'take-one, take-all' provision], Congress intended to increase the availability of low-income housing." *Knapp, supra,* 54 *F.*3d at 1278; *see also* H.R. No. 100–122(I), at 32 (1987), *reprinted in* 1987 U.S.C.C.A.N. at 3348 (expressing concern over fact that Section 8 voucher/certificate holders experience problems securing units "[b]ecause owners often unreasonably refuse to rent units to applicants who hold [Section 8 vouchers/certificates]"); Mark A. Malaspina, Note, *Demanding the Best: How to Restructure the Section 8 Household–Based Rental Assistance Program,* 14 *Yale L. & Pol'y Rev.* 287, 288, 311 (1996) (noting that Section 8 recipients often cannot find desirable apartments because many landlords refuse to rent to such individuals and that low landlord participation is a serious, if not the most serious, problem with the

Section 8 program). The "take-one, take-all" provision was suspended in 1996, and was repealed as part of the Quality Housing and Work Responsibility Act of 1998 because it was having the unintended effect of discouraging landlords from accepting their first Section 8 tenant. See Paula Beck, *Fighting Section 8 Discrimination: The Fair Housing Act's New Frontier*, 31 *Harv. C.R.-C.L. L.Rev.* 155, 167 (Winter 1996) (noting that "take-one, take-all" provision serves as disincentive for landlords to rent to *any* Section 8 tenant). The Committee on Banking, Housing, and Urban Affairs, in its report on the act that repealed the "take-one, take-all" provision, anticipated that the repeal would not "adversely affect assisted households because protections will be continued under State ... and local tenant laws." S.Rep. No. 105–21, at 86 (1997).

The "take-one, take-all" provision was examined by the Second Circuit in *Salute, supra*, 136 *F*.3d 293. In that case the property owner refused to rent apartments to two Section 8 recipients. The owner had never accepted a tenant who, at the time of the application for an apartment, was receiving Section 8 assistance. However, the owner had accepted Section 8 vouchers from four existing tenants who had acquired Section 8 status during their tenancy. The rejected tenants claimed that the owner's action violated the "take-one, take-all" provision of Section 8. The *Salute* court read an exception into that provision, and held that the provision did not apply where the only Section 8 tenants in a landlord's building are tenants who became eligible for assistance during their tenancy. *Id.* at 297. In so holding, the Second Circuit found that "the voluntariness provision of Section 8 [permitting landlords to select tenants] reflects a congressional intent that the burdens of Section 8 participation are substantial enough that participation should not be forced on landlords." *Id.* at 300. Whether states are preempted from mandating landlord participation in Section 8 was not an issue in *Salute,* because the court considered only the "take-one, take-all" federal provision.

B

That "[a] statute should be interpreted in accordance with its plain meaning if it is 'clear and unambiguous on its face and admits of only one interpretation'" is a well-established canon of statutory construction. *Board of Educ. of Neptune v. Neptune Township Educ. Ass'n,* 144 *N.J.* 16, 25, 675 *A.*2d 611 (1996) (quoting *State v. Butler,* 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982)). In addition, "[w]hen construing a statute, the judicial role is to give effect to the legislative intent." *Brooks v. Odom,* 150 *N.J.* 395, 401, 696 *A.*2d 619 (1997); *see also Alexander v. New Jersey Power & Light Co.,* 21 *N.J.* 373, 378, 122 *A.*2d 339 (1956) ("The spirit of the legislative direction prevails over the literal sense of the terms."). "[L]egislative language must not, if reasonably avoidable, be found to be inoperative, superfluous or meaningless." *In re Sussex County Mun. Utils. Auth.,* 198 *N.J.Super.* 214, 217, 486 *A.*2d 932 (App.Div.1985) (quoting *Hackensack Bd. of Educ. v. Hackensack,* 63 *N.J.Super.* 560, 569, 165 *A.*2d 33 (App.Div.1960)). We keep those tenets in mind as we analyze *N.J.S.A.* 2A:42–100.

Apart from the decision by the Appellate Division in this case, only one published opinion in this state has addressed *N.J.S.A.* 2A:42–100. See *Kentwood Constr., supra,* 278 *N.J.Super.* 346, 651 *A.*2d 101. In *Kentwood Construction,* a landlord refused to accept a Section 8 voucher from an existing tenant, although the landlord had other Section 8 tenants in its building at the time. *Id.* at 349, 651 *A.*2d 101. The court held that the landlord's refusal to accept the Section 8 voucher "runs counter to the letter and spirit of *N.J.S.A.* 2A:42–100," which prohibits such discriminatory conduct, despite the fact that the federal Section 8 statute makes landlord participation voluntary. *Id.* at 350, 651 *A.*2d 101; *see also Glover v. Crestwood Lake Section 1 Holding Corp.,* 746 *F.Supp.* 301, 309 (S.D.N.Y.1990) (holding that landlord's refusal to accept portions of Section 8 lease constituted impermissible "refusal to rent an apartment to a Section 8 voucher holder applicant as a result of that applicant's status as a Section 8 voucher holder"). *But cf. Knapp, supra,* 54 *F.*3d at 1282 (holding that landlord's refusal to

accept Section 8 rental vouchers did not violate Wisconsin Open Housing Act, which prohibits landlords from discriminating in housing on the basis of a tenant's "lawful source of income").

The holding in *Kentwood Construction* was limited to existing tenants who become eligible for Section 8 vouchers during their tenancy. That court observed, however, that "a *prospective* tenant deemed eligible for Section 8 assistance has no claim of entitlement and the landlord, for a nondiscriminating and lawful reason, may reject the person as a tenant." *Kentwood Constr., supra,* 278 *N.J.Super.* at 349, 651 *A.*2d 101 (emphasis supplied). Further, the facts in *Kentwood Construction* differ from those in this appeal because the owner in *Kentwood Construction* had previously accepted Section 8 tenants and had other Section 8 tenants in its building at the time the plaintiff tendered the Section 8 voucher to the landlord. *Ibid.*

■ New Jersey's strong public policy of protecting tenants from unjustified evictions is reflected by the Anti–Eviction Act, *N.J.S.A.* 2A:18–61.1 to –61.12, which requires a showing of good cause to terminate a residential tenancy. Essentially, if a landlord is unable to demonstrate good cause as defined by the statute, it is obligated to renew the tenant's lease. See *Chase Manhattan Bank v. Josephson,* 135 *N.J.* 209, 219, 638 *A.*2d 1301 (1994). Although the Anti–Eviction Act "is in derogation of the landlord's common-law rights of ownership, . . . landlord rights must to some extent and on general welfare grounds defer to the needs of the tenant population in this state." *Morristown Memorial Hosp. v. Wokem Mortgage &· Realty Co.,* 192 *N.J.Super.* 182, 188, 469 *A.*2d 515 (App.Div.1983) (citation omitted).

■ "The purpose of [the Anti–Eviction Act] is to protect residential tenants from the effects of what the Legislature has deemed to be a severe shortage of rental housing in this state." *Harden v. Pritzert,* 178 *N.J.Super.* 237, 240, 428 *A.*2d 927 (App. Div.1981). That purpose was clearly set forth by the Legislature in the statement attached to *L.* 1974, *c.* 49, codified as *N.J.S.A.* 2A:18–61.1:

> At present, there are no limitations imposed by statute upon the reasons a landlord may utilize to evict a tenant. As a result, residential tenants frequently have been unfairly and arbitrarily ousted from housing quarters in which they have been comfortable and where they have not caused any problems. This is a serious matter, particularly now that there is a critical shortage of rental housing space in New Jersey. This act shall limit the eviction of tenants by landlords to reasonable grounds and provide that suitable notice shall be given to tenants when an action for eviction is instituted by the landlord.

*See also N.J.S.A.* 2A:18–61.1a (setting forth legislative findings and intent of Anti–Eviction Act).

### C

There are several theories under which federal law will preempt a state statute. We begin by noting that "pre-emption is not to be lightly presumed," *California Fed. Sav. & Loan Ass'n v. Guerra,* 479 *U.S.* 272, 281, 107 *S.Ct.* 683, 689, 93 *L. Ed.*2d 613, 623 (1987), and that "the historic police powers of the States [are] not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress," *Wisconsin Pub. Intervenor v. Mortier,* 501 *U.S.* 597, 605, 111 *S.Ct.* 2476, 2482, 115 *L. Ed.*2d 532, 543 (1991) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 *U.S.* 218, 230, 67 *S.Ct.* 1146, 1152, 91 *L. Ed.* 1447, 1459 (1947)); *see also Loretto v. Teleprompter Manhattan CATV Corp.,* 458 *U.S.* 419, 440, 102 *S.Ct.* 3164, 3178, 73 *L. Ed.*2d 868, 885 (1982) (acknowledging that states traditionally have had broad power to regulate housing conditions and relationships between landlord and tenants). The party claiming preemption bears the burden of supporting that claim by "clear and manifest evidence." *Pennsylvania Med. Soc'y v. Marconis,* 942 *F.*2d 842, 853 (3d Cir.1991).

Congress explicitly may express its intent to preempt state law. *Schneidewind v. ANR Pipeline Co.,* 485 *U.S.* 293, 299, 108 *S.Ct.* 1145, 1150, 99 *L. Ed.*2d 316, 325 (1988); *Feldman v. Lederle Lab.,* 125 *N.J.* 117, 134, 592 *A.*2d 1176 (1991). Alternatively, preemption may be inferred where the federal legislation is so comprehensive that it creates the inference that Congress intended to leave no room for state regulation in the area. *Hillsborough County v. Automated Med. Lab., Inc.,* 471 *U.S.* 707,

713, 105 *S.Ct.* 2371, 2375, 85 *L. Ed.*2d 714, 721 (1985); *Dewey v. R.J. Reynolds Tobacco Co.*, 121 *N.J.* 69, 77, 577 *A.*2d 1239 (1990).

Preemption also may be found where state law actually conflicts with federal law. *Guerra, supra*, 479 *U.S.* at 281, 107 *S.Ct.* at 689, 93 *L. Ed.*2d at 623. Conflict preemption occurs in two instances: where "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 *U.S.* 132, 142–43, 83 *S.Ct.* 1210, 1217–18, 10 *L. Ed.*2d 248, 257 (1963), or where a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Michigan Canners & Freezers Ass'n v. Agricultural Mktg. & Bargaining Bd.*, 467 *U.S.* 461, 470, 104 *S.Ct.* 2518, 2523, 81 *L. Ed.*2d 399, 406 (1984) (quoting *Hines v. Davidowitz*, 312 *U.S.* 52, 67, 61 *S.Ct.* 399, 404, 85 *L. Ed.* 581, 587 (1941)); *Feldman, supra*, 125 *N.J.* at 135, 592 *A.*2d 1176. Under conflict preemption analysis, a court first must consider the purposes of the federal law, and then evaluate the effect of the state law on those purposes. *Finberg v. Sullivan*, 634 *F.*2d 50, 63 (3d Cir.1980).

The Massachusetts Supreme Court addressed the issue of Section 8 preemption in *Attorney General v. Brown, supra*, 400 *Mass.* 826, 511 *N.E.*2d 1103. Specifically, the court considered whether a state statute that prohibited landlords from refusing to rent to persons who receive rental assistance was preempted by Section 8. *Id.* 511 *N.E.*2d at 1105. After considering the various theories under which federal law may preempt a state statute, the court focused its inquiry on whether the Massachusetts statute constituted "an obstacle to the accomplishment of the Federal purpose [of the Section 8 program]." *Id.* 511 N.E.2d at 1106 (quoting *Hines, supra*, 312 *U.S.* at 67, 61 *S.Ct.* at 404, 85 *L. Ed.* at 587). The court rejected the argument that the state statute conflicted with the federal statute by "mandat[ing] a landlord's participation in a voluntary Federal program and, therefore, violat[ed] the supremacy clause." *Ibid.* Instead, the court found that both statutes "share a common goal, *i.e.*, affordable, decent housing for

those of low income." *Ibid.* The fact that Congress made participation in the Section 8 program voluntary did not, the court concluded, preclude states from mandating participation. *Ibid. But see Knapp, supra,* 54 *F.*3d at 1282 (noting, in *dicta,* that "[i]t seems questionable ... to allow a state to make a voluntary federal program mandatory.").

Federal courts have permitted states to impose greater restrictions than those imposed by federal law. For example, in *Guerra, supra,* 479 *U.S.* 272, 107 *S.Ct.* 683, 93 *L. Ed.*2d 613, the Supreme Court considered whether a California statute that required employers to give pregnant women preferential treatment was preempted by the federal Pregnancy Discrimination Act of 1978, 42 *U.S.C.A.* § 2000e(k), that did not require such treatment. *Id.* at 285, 107 *S.Ct.* at 692, 93 *L. Ed.*2d at 626. In concluding that the state law was not preempted, the Court found that the fact that Congress did not require preferential treatment does not demonstrate that Congress intended to prohibit such action. The Court stated that "[i]t is hardly conceivable that Congress would have extensively discussed only its intent not to require preferential treatment if in fact it had intended to prohibit such treatment." *Id.* at 287, 107 *S.Ct.* at 692, 93 *L. Ed.*2d at 627. The preemption issue in *Guerra* is distinguishable from the question before us because two sections of the Civil Rights Act specifically provide that state laws are not preempted unless they actually conflict with the federal act. *Id.* at 281–82, 107 *S.Ct.* at 689–90, 93 *L. Ed.*2d at 624 (citing 42 *U.S.C.A.* §§ 2000e–7, 2000h–4). The Court in *Guerra* also noted that, in the debates and reports on the bill, Congress repeatedly acknowledged that several states had laws similar to California's law, but Congress failed to manifest its intent to supersede those laws. *Id.* at 287–88, 107 *S.Ct.* at 693, 93 *L. Ed.*2d at 627–28; *see also Associated Indus. of Mass. v. Snow,* 898 *F.*2d 274, 283 (1st Cir.1990) (finding no preemption because "the question is not whether a congressionally calibrated system is altered by state law, but if altered, whether the change obstructs the purpose of Congress").

Similarly, this Court has held that state laws imposing stricter requirements than federal law are not necessarily preempted.  In *Lederle Laboratories, supra,* 125 *N.J.* 117, 592 *A.*2d 1176, the issue was whether the plaintiff's failure-to-warn claim was preempted by relevant federal statutes and regulations.  The defendant argued that it could not be held strictly liable under New Jersey law for its failure to warn that an antibiotic it manufactured could cause tooth staining because to do so would have violated federal statutes and regulations prohibiting the issuance of warnings without prior approval of the Food and Drug Administration (FDA).  *Id.* at 146, 592 *A.*2d 1176.  In holding that there was no preemption, we found that imposing state-law liability was completely consistent "with the primary purpose of the FDA to promote and protect the health of the citizens of the United States," *id.* at 154, 592 *A.*2d 1176, observing that "immunizing a drug manufacturer against liability for marketing a product without a warning of a known or knowable risk is in conflict with Congress' well-recognized purpose in enacting the [Federal Food, Drug and Cosmetic Act]".  *Ibid.*

### III

We affirm the Appellate Division's holding that a landlord's refusal to accept a Section 8 voucher violates both the letter and the spirit of *N.J.S.A.* 2A:42–100.  304 *N.J.Super.* at 589, 701 *A.*2d 739.  The plain language of the statute, the legislative history, and our state's important policy of providing protection for low-income tenants all support the conclusion that the statute encompasses Section 8 vouchers.  We find it highly unlikely that the Legislature, having demonstrated its strong commitment to the protection of tenants from unjustifiable evictions, would have intended to permit the eviction of an exemplary tenant solely for the reason that the federal government has found her qualified to participate in the Section 8 housing program pursuant to which the government pays a portion of her rent.

We are not persuaded by the contrary holding of the Seventh Circuit in *Knapp, supra,* 54 *F.*3d 1272. The Wisconsin statute in that case prohibited landlords from discriminating on the basis of a person's lawful source of income, but not on the basis of the source of a lawful rent payment. In contrast, our Legislature specifically included language prohibiting discrimination based on the source of a lawful rent payment.

Concerning the question of federal preemption, we find nothing in the federal statute explicitly preempting state legislation requiring landlords to honor Section 8 vouchers. HUD has explicitly preempted state law elsewhere, and could have done so here. *See, e.g.,* 24 *C.F.R.* § 850.153 (preempting state and local rent control laws under Housing Development Grant Program); 24 *C.F.R.* § 982.354(b) (preempting any state law imposing limitation on jurisdiction of local housing authority when voucher holder moves to another area under portability provision of Section 8). Nor is the federal statute so comprehensive as to create an inference that Congress intended that there be no state regulation. To the contrary, the Section 8 program contemplates substantial state participation, and we are unpersuaded that the provisions of Section 8 and those of our state statute cannot be harmonized. We turn our attention, therefore, to the question whether *N.J.S.A.* 2A:42–100 constitutes an obstacle to the goals and purposes of the Section 8 program.

That 42 *U.S.C.A.* § 1437f does not mandate landlord participation in the Section 8 program is undisputed. However, the voluntary nature of the Section 8 program is not at the heart of the federal scheme. The inference that the program is voluntary derives only from one section of the statute that permits landlords to screen potential tenants, and no language in that provision implies that a landlord's right to screen tenants includes the right to reject tenants solely on the basis that they are qualified for governmental rental assistance. See 42 *U.S.C.A.* § 1437f(d)(1)(A). Nothing in the statute, however, mandates that landlord partic-

ipation in the Section 8 program be voluntary, nor is there any provision that prohibits states from mandating participation.

That conclusion is supported by the history of 42 *U.S.C.A.* § 1437f(t), the "take-one, take-all" provision. That provision was enacted to increase the availability of low-income housing. It was repealed only because it was having the unintended effect of discouraging landlords from joining the Section 8 program. The goal of Congress, however, has always been to assist in providing housing to low-income families.

New Jersey shares that goal, as demonstrated by our strong public policy of protecting low-income tenants from discrimination and unjustified eviction. The anti-discrimination provision of *N.J.S.A.* 2A:42–100, which prohibits discrimination against tenants based on "the source of any lawful rent payment," is one of the legislative enactments by which New Jersey promotes its goal of providing affordable housing to its citizens. We are confident that application of the statute's anti-discrimination provision to protect tenants who are eligible to receive Section 8 vouchers will neither conflict with nor frustrate the objectives of Congress in enacting the Section 8 program.

We also consider recent welfare reform efforts that have dedicated funds to the Section 8 program in an effort to assist people in the transition from welfare to work. See Quality Housing and Work Responsibility Act of 1998, at 11–12 (appropriating $238,-000,000 for Section 8 rental assistance "to help eligible families make the transition from welfare to work"); Peter W. Salsich, Jr., *Welfare Reform: Is Self Sufficiency Feasible Without Affordable Housing?*, 2 *Mich. L. & Pol'y Rev.* 43, 51 (1997) (noting that "[h]ousing plays a major part in any effort at becoming self-sufficient"). HUD's own Family Self–Sufficiency program "coordinate[s] the use of ... housing assistance under the Section 8 rental certificate and rental voucher programs with public and private resources, to enable families eligible to receive assistance under these programs to achieve economic independence and self-sufficiency." 24 *C.F.R.* § 984.101. Requiring landlords to accept

Section 8 vouchers from existing tenants will facilitate those welfare reform efforts.

We acknowledge Franklin Tower's contention that to require landlord participation in the Section 8 program is unfair because of the substantial burdens imposed by the program's regulatory requirements. The record does not support the assertion of Franklin Tower and related *amici* that the HQSs and other program requirements are overly burdensome. Landlords in New Jersey are already subject to numerous regulations concerning the maintenance of their properties and relations with their tenants. *See, e.g.,* Anti–Eviction Act, *N.J.S.A.* 2A:18–61.1 to –61.12 (requiring "good cause" for eviction of residential tenant); Rent Security Deposit Act, *N.J.S.A.* 46:8–19 to –26 (imposing limitations and requirements on security deposit collected by landlord); *N.J.S.A.* 46:8–27 to –29 (requiring landlords to file certificate of registration with municipality where property is located, and to provide tenants with copy of same); Hotel and Multiple Dwelling Law, *N.J.S.A.* 55:13A–1 to –28 (requiring landlord to satisfy standards concerning, among other things, structural adequacy, methods of egress, garbage collection and disposal, electrical wiring); West New York Code ch. 182 (municipal rent control ordinance). In addition, we note that some of the burdens alleged by Franklin Tower were altered or eliminated by the recent amendments to the Section 8 program. *Supra* at 609, 725 *A.*2d 1108. To permit a landlord to decline participation in the Section 8 program in order to avoid the "bureaucracy" of the program would create the risk that "[i]f all landlords ... did not want to 'fill out the forms' then there would be no Section 8 housing available." *Templeton Arms v. Feins,* 220 *N.J.Super.* 1, 9, 531 *A.*2d 361 (App.Div.1987).

We note that *N.J.S.A.* 2A:42–100 exempts only owner-occupied houses with no more than two units, and that therefore our decision will apply to smaller residential units such as three-and four-family buildings. Nevertheless, we anticipate that the impact of our decision will not impose significantly greater burdens on owners of small buildings than on owners of larger ones. Nothing

in the record before us suggests that compliance with the requirements of the Section 8 program is more onerous for the owner of a three-family house than for the owner of a large apartment building. Further, we emphasize that in the case of an existing tenant, the landlord has had the opportunity to screen the tenant and has decided to accept the tenant prior to that tenant's becoming eligible for Section 8 assistance. Similarly, although the issue is not before us, we acknowledge that a landlord approached by a prospective tenant eligible for Section 8 assistance has the full right to screen and review the tenant's references, background, employment and rental history to verify that the tenant is otherwise qualified to reside in the landlord's building. See 42 *U.S.C.A.* § 1437f(d)(1)(A); 24 *C.F.R.* § 982.307. Moreover, if we have misperceived the effect of the application of *N.J.S.A.* 2A:42–100 to owners of smaller rental housing units, the Legislature is free to reconsider the scope of the statute's application.

The Appellate Division below relied, in part, on *Kentwood Construction, supra,* 278 *N.J.Super.* 346, 651 *A.*2d 101, which addressed the rights of existing tenants who become eligible for Section 8 assistance during the course of their tenancies, as opposed to prospective tenants who are already receiving Section 8 assistance when they apply for an apartment. Because N.M. was residing in Franklin Tower's building when she became eligible for Section 8 assistance, this appeal does not require us to decide whether a property owner who has never participated in the Section 8 program would be required to accept a new tenant who was receiving Section 8 assistance at the time she applied for the apartment. We note, however, that *N.J.S.A.* 2A:42–100 makes no distinction between existing tenants and prospective tenants. It simply prohibits discrimination based on a tenant's source of income or the source of a tenant's lawful rental payments.

We hold that the requirements of *N.J.S.A.* 2A:42–100 do not stand as an obstacle to the accomplishment of the objectives of the Section 8 program, but, to the contrary, advance those goals. Therefore, the statute is not preempted by 42 *U.S.C.A.* § 1437f.

Because we find that *N.J.S.A.* 2A:42–100 prohibits landlords from refusing to accept a Section 8 voucher from an existing tenant, we need not address whether Franklin Tower's refusal to accept the Section 8 voucher violated the implied covenant of good faith and fair dealing in its lease with N.M.

## IV

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.