933 A.2d 613

HOUSING AUTHORITY OF THE CITY OF BAYONNE, PLAINTIFF–RESPONDENT, v. DEBORAH MIMS AND SINCER-RAE ROSS, DEFENDANTS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued September 10, 2007—Decided October 15, 2007.

196

Before Judges WEISSBARD, S.L. REISNER and GILROY.

*Adrian Castellanos* argued the cause for appellants *Deborah Mims* and *Sincerrae Ross* (*Northeast New Jersey Legal Services, Inc.,* attorneys; *Mr. Castellanos,* of counsel and on the brief).

*Jeanette M. Samra–Arteaga* argued the cause for respondent (*Fitzpatrick & Merritt,* attorneys; *Ms. Samra–Arteaga,* of counsel and on the brief).

The opinion of the court was delivered by

WEISSBARD, J.A.D.

In this landlord-tenant action, the trial court found that plaintiff, Housing Authority of the City of Bayonne (the Authority), established two of three grounds alleged as the basis for eviction of defendants Deborah Mims and her daughter, Sincerrae Ross. Nonetheless, the court found that the Authority had filed its action for eviction in retaliation for complaints made by defendants, thereby violating the Tenant Reprisal Act (TRA or the Act), *N.J.S.A.* 2A:42–10.10 to –10.14. Ordinarily, such a finding would void the eviction; however, the judge ruled that the TRA was preempted by federal law governing public housing authorities. We conclude that the TRA is not preempted, thereby entitling defendants to judgment dismissing the eviction complaint.

Defendants are longtime tenants of the Authority, pursuant to a written lease. On December 22, 2005, the Authority filed an eviction complaint in the Special Civil Part, Landlord–Tenant Division. The Authority alleged three specific violations of the lease and rules and regulations incorporated into the lease, providing grounds for eviction pursuant to *N.J.S.A.* 2A:18–61.1(d) and (e)(1).

The grounds set forth in the complaint were: (1) not permitting the landlord to enter defendants' apartment during reasonable hours for landlord's exterminator to perform routine extermination; (2) providing accommodations to a person not listed on the lease; and (3) failing to adhere to the Authority's pet policy. A fourth allegation provided that defendant repeatedly violated the landlord's rules or regulations despite previous notices; however, this ground simply relied on the other three. The complaint alleged that on September 29, 2005, the Authority served on defendants a written notice to quit and demand for possession, terminating their tenancy as of November 1, 2005. The complaint alleged that notices to cease had been served on defendants on April 28, July 19 and August 12, 2005.[1]

The matter was tried over five days, concluding on April 27, 2006. On May 16, 2006, the judge issued a written opinion. First, the judge addressed each of the three grounds alleged as a basis for eviction. There is no necessity for us to recite the evidence or the judge's findings in detail. The judge found that the Authority had not sustained its burden of proof as to the exterminator access allegation but had met its burden as to the pet and unauthorized occupant issues. Defendants have not challenged the judge's factual determinations, which are well supported by the record, and we are bound by them. *Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974).

---

[1] The April 12 notice recited all of the grounds set forth in the complaint; the July 19 notice only dealt with the unlisted occupant; the August 12 notice only specified the exterminator's lack of access.

Next, the judge addressed defendants' defense that the Authority acted in retaliation, thereby violating *N.J.S.A.* 2A:42–10.10, which reads in pertinent part as follows:

No landlord . . . shall serve a notice to quit upon any tenant or institute any action against any tenant to recover possession of premises . . . :

a. As a reprisal for the tenant's efforts to secure or enforce any rights under a lease or contract, or under the laws of the State of New Jersey or its governmental subdivisions, or of the United States; or

b. As a reprisal for the tenant's good faith complaint to a governmental authority of the landlord's alleged violation of any health or safety law, regulation, code or ordinance, or State law or regulation which has its objective the regulation of premises used for dwelling purposes.

### The judge noted the following exhibits offered by defendants:

September 20, 1999—A complaint to management about bags of trash in the hallways

December 14, 2001—A complaint to management about lack of heat in the bathrooms

June 30, 2003—A complaint to HUD about flies, gnats and mosquitoes

July 9, 2003—A complaint to management . . . about a complaint that was apparently made by another tenant about Defendants

May 8, 2004—A complaint to the Mayor . . . about the manners of the Authority's employees on the phone

October 5, 2004—A complaint to management about leaking bathrooms and falling ceilings (and noting that when management contacted the tenant, that Mark Ross handled the contact)

May 18, 2005—A five page complaint to HUD about several alleged problems

October 3, 2005—A complaint to management about having called Ms. Mims at work, instead of at home

### The judge continued as follows:

Defendants argue that this documentary evidence supports their argument that the eviction is retaliatory and that these letters show a pattern of complaints and notices to cease in response to the letters and the most striking examples are D12 and D13. In D12, dated October 7, 2004, Thomas Adams responds to Ms. Mims complaint. Then on the same day in, D13, a notice to cease dated October 7, 2004, Mr. Adams warns her of a possible eviction. Also, Ms. Mims' complaint to the Department of Housing and Urban Development and the Housing Authority's subsequent response to her letter (D18 and D19) are convincing evidence of retaliation. In the last paragraph of D19 John Mahon specifically states that the Bayonne Housing Authority has been and will continue investigating her lease violations because of her accusations. Defendants suggest that the language makes clear the fact that the notices to cease regarding the lease violations are due to her complaints—however, I do not accept that proposition from that letter.

Instead, I interpret Mr. Mahon's letter to say that Ms. Mims' letter would not deter the continued investigation by the Authority of Ms. Mims' alleged breaches. Defendants note that Ms. Mims seems to have received notices to cease in May 2004 and April 2005 for which there is no corresponding written complaint which is close in time, but that she did testify that she made both verbal and written complaints to the Housing Authority. Both D10 and D12 refer to oral complaints that she made. In D10 she memorialized a conversation where she complained to the Housing Authority. D12 is even stronger evidence of her verbal complaints as Mr. Adams acknowledges the complaint in the first line of the letter. In addition, Defendants argue, it's clear that these notices are retaliatory when read in light of Mr. Mahon's statement in D19 regarding the Housing Authority's history of investigations because of Ms. Mims complaints and that the Notice to Quit served on the defendants on September 29, 2005 is retaliatory as it relies on the notices to cease. And, Defendants argue, the notices were clearly served in retaliation for Ms. Mims' complaints to secure her rights under the law. *N.J.S.A.* 2A:42–10.10 a. and b. The remedy urged by Defendants is that the Court should find that the Notice to Quit is invalid as it was served for the purpose of retaliation for the Defendant's complaints.

Defendants also urge the rebuttable presumption that arises once a tenant makes a complaint. *N.J.S.A.* 2A:42–10.12 and that in spite of the Plaintiff's many witnesses, Plaintiff's notices were too closely linked to defendants complaints for the Plaintiff to have met its burden. Furthermore, even if the Plaintiff had a legitimate reason for removing the defendants the Plaintiff's non retaliatory motive precludes the Plaintiff from evicting the Defendant using the current notice to quit. *Les Gertrude Assoc. v. Walko,* 262 *N.J.Super.* 544 [621 *A.*2d 522] (App.Div.1993). Plaintiffs argument against the defense of retaliation is that "not one ounce of evidence was presented at trial to support" that defense and that in fact, Ms. Mims' own documents belie her defense; that many of Ms. Mims' complaints came after May of 2004 when the Authority initially noticed her regarding the lease violations. Ms. Mims even filed a complaint with the U.S. Department of Housing and Urban Development ("HUD") regarding the kitchens and bathrooms after the Authority sent her the second notice to cease regarding the lease violations on April 28, 2005. This, in itself, can be seen as retaliation *against the Authority* since many of the claims proved to be unsubstantiated. Of even more significance, Ms. Mims filed a grievance regarding her rent calculation which grievance the Authority, itself, resolved in her favor. Therefore, little credence should be given to this line of defense.

I find that the holding in *Les Gertrude Assoc. v. Walko,* [*supra*] would require the dismissal of this complaint because of the number and chronology of the Defendants' complaints and the dates of the notices served, notwithstanding what I find to have been legitimate reasons and good cause for the Plaintiff's having filed this complaint.

■ Those findings are supported by the evidence, and to the extent the Authority seeks to tangentially attack the finding of retaliation, we reject its argument.

■ Finally, and most relevant to the present appeal, the judge concluded that the TRA was preempted by federal law. We review that legal determination de novo, *Manalapan Realty L.P. v. Twp. Comm.*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995), and conclude that the decision was in error.

In *R.F. v. Abbott Lab.*, 162 *N.J.* 596, 618, 745 *A.*2d 1174 (2000) (citing Lawrence H. Tribe, American Constitutional *Law, Vol. I,* § 6–28 (3d ed.2000)), the Court quoted Professor Tribe to the effect that preemption has three varieties, "usually defined as express preemption, implied preemption, and conflict preemption." However, in the same decision the Court quoted Professor Chemerinsky for the proposition that implied preemption itself has three parts:

> (1) field preemption "where the scheme of federal law and regulation is 'so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it;'" (2) conflict preemption, where there is a conflict between federal and state law, rendering "'compliance with both federal and state regulations ... a physical impossibility;'" and (3) preemption where "state law impedes the achievement of a federal objective;" in this case, even if federal and state law are "not mutually exclusive ... preemption will be found if state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"
>
> [*Id.* at 620, 745 *A.*2d 1174 (quoting Erwin Chemerinsky, *Constitutional Law: Principles and Policies* § 5.2.1 (1997)).]

In his treatise, just preceding the above quote, Chemerinsky follows the Supreme Court formulation which describes preemption as either express or implied. *Ibid.* (citing *Gade v. Nat'l Solid Waste Management Assoc.*, 505 *U.S.* 88, 98, 112 *S.Ct.* 2374, 2383, 120 *L.Ed.*2d 73, 84 (1992)). A further source of confusion on the subject flows from *Franklin Tower One, LLC v. N.M.*, 157 *N.J.* 602, 615–17, 725 *A.*2d 1104 (1999), where the Court formulated the categories somewhat differently. Implied preemption was equated with field preemption and conflict preemption was said to have only two sub-parts, those denoted (2) and (3) in the quote from *R.F.* (quoting Chemerinsky) above. Even earlier, in *Dewey v. R.J. Reynolds*, 121 *N.J.* 69, 83, 577 *A.*2d 1239 (1990), the Court followed *Cipollone v. Liggett Group*, 789 *F.*2d 181, 186 (3d Cir.1986), in which the federal court described field preemption as part of

implied preemption and actual conflict preemption—the creation of an obstacle to the fulfillment of the purposes and objectives of Congress—as another form of implied preemption.

■ Despite these divergent formulations, the various parts and sub-parts of preemption are clear. Further, none of the categories "are ... perfectly distinct and in practice often overlap." *R.F., supra,* 162 *N.J.* at 618, 745 *A.2d* 1174; *See also Gade, supra,* 505 *U.S.* at 103 n. 2, 112 *S.Ct.* at 2386 n. 2, 120 *L.Ed.2d* at 88 n. 2.

■ As the Court noted in *Franklin Tower One,* 157 *N.J.* at 615, 725 *A.2d* 1104, "pre-emption is not lightly to be presumed" (quoting *California Federal Savings & Loan Ass'n v. Guerra,* 479 *U.S.* 272, 281, 107 *S.Ct.* 683, 689, 93 *L.Ed.2d* 613, 623 (1987)), and "[t]he party claiming preemption bears the burden of supporting that claim by 'clear and manifest evidence.' " *Ibid.* (quoting *Pennsylvania Med. Soc'y v. Marconis,* 942 *F.*2d 842, 853 (3d Cir.1991)).

In this case the trial judge determined

that the conflict between New Jersey's retaliation statute and the grounds permitted for eviction from public housing is found in the comprehensive scheme of federal laws and regulations as contrasted with the State's retaliation statute. Simply stated, if a landlord proves a ground for eviction provided by federal legislation or regulation, can the State provide a defense to that ground? If the answer is affirmative, it conflicts with the federal provision and avoids the federal ground for eviction. Or, as quoted above, the State law would "stand[s] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

Referring to the categories set out earlier, the judge found that this situation presented "conflict preemption" and, inferentially, "field preemption." None of the other categories are involved in this case.

■ First, we reject the applicability of field preemption. It is clear that federal law dealing with tenant evictions from public housing specifically incorporates state law. While federal regulations specify what can and cannot be contained in a lease between a public housing authority and a tenant, 24 *CFR* § 966.4, including the grounds for termination of the tenancy, *id.* at § 966.4(e)(2); 24

*CFR* § 247.3, a regulation also provides that evictions may only be ordered "by judicial action pursuant to state or local law." 24 *CFR* § 247.6(a). Furthermore, § 247.6(c) provides as follows:

A tenant may rely on State or local law governing eviction procedures where such law provides the tenant procedural rights which are in addition to those provided by this subpart, except where such state or local law has been preempted under part 246 of this chapter[2] or by other action of the United States.

 As this latter provision makes clear, it cannot be said that "the scheme of federal law and regulation is 'so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it.' " *R.F., supra,* 162 *N.J.* at 620, 745 *A.*2d 1174 (quoting Chemerinsky, *supra,* § 5.2). In this situation, Congress explicitly provided for the states to supplement its otherwise pervasive scheme of regulation.[3]

 We turn to conflict preemption, which comes into play "where state law actually conflicts with federal law." *Franklin Tower, supra* 157 *N.J.* at 618, 725 *A.*2d 1104 (citing *Guerra, supra,* 479 *U.S.* at 281, 107 *S.Ct.* at 689, 93 *L.Ed.*2d at 623).

Conflict preemption occurs in two instances: where "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 *U.S.,* 132, 142–43, 83 *S.Ct.* 1210, 1217–18, 10 *L.Ed.*2d 248, 257 (1963), or where a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Michigan Canners & Freezers Ass'n v. Agricultural Marketing & Bargaining Board,* 467 *U.S.* 461, 470, 104 *S.Ct.* 2518, 2523, 81 *L.Ed.*2d 399, 406 (1984) (quoting *Hines v. Davidowitz,* 312 *U.S.* 52, 67, 61 *S.Ct.* 399, 404, 85 *L.Ed.* 581, 587 (1941)); *Feldman [v. Lederle Labs],* 125 *N.J.* [117] at 135[, 592 *A.*2d 1176 (1991) ]. Under conflict preemption analysis, a court first must consider the purposes of the federal law, and then evaluate the effect of the state law on those purposes. *Finberg v. Sullivan,* 634 *F.*2d 50, 63 (3d Cir.1980).

[*Id.* at 616, 725 *A.*2d 1104.]

*See also Housing Auth. & Urban Redevelopment Agency of Atlantic City v. Taylor,* 171 *N.J.* 580, 587–88, 796 *A.*2d 193 (2002);

---

[2] The referenced part, 24 *CFR* § 246, has no applicability here. It concerns regulation of rental charges. *See* 24 *CFR* § 246.5.

[3] For preemption purposes federal regulations are treated the same as federal laws. *R.F., supra,* 162 *N.J.* at 619, 745 *A.*2d 1174.

*Dewey v. R.J. Reynolds Tobacco Co.,* 121 *N.J.* at 86–87, 577 *A.*2d 1239.

To the extent the TRA is viewed as providing added "procedural rights," 24 *CFR* § 247.6(c) (quoted in full above), not only is it not preempted, but it is explicitly authorized. Even if it is not procedural, but substantive, there is no implied preemption by conflict,[4] as the trial judge found.

Addressing the purpose of the federal law, in *Housing Authority of the City of Newark v. Scott,* 137 *N.J.Super.* 110, 116, 348 *A.*2d 195 (App.Div.1975), we noted that the

essential objective of the federal law is to assist state and local governments in alleviating "unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income * * *." 42 *U.S.C.A.* § 1401.[5] *See also N.J.S.A.* 55:14A-8 which provides for fixing rents at the "lowest possible rates consistent with its providing decent, safe, and sanitary dwelling accommodations * * *." It is not the statutory design to require tenants to subsidize public housing by paying rent for substandard accommodations. The payment of rent and the maintenance by the landlord of decent safe and sanitary dwelling units are correlative, "mutually dependent" obligations. *See Berzito v. Gambino, supra* 63 *N.J.* at 469, 308 *A.*2d 17.

Judged by these standards, we discern no conflict between the purpose of the federal law, either statutes or regulations, and the TRA, at least on the facts of this case. Here, a number of defendants' complaints to the Authority concerned living conditions, such as trash in the hallways, lack of heat, insects, and leaks and falling ceilings in bathrooms. To permit a landlord to retaliate against a tenant for such complaints would tend to stifle the reporting of unsafe and unsanitary living conditions, directly contrary to the expressed purpose of the federal law to guarantee proper living conditions. The TRA does not stand as

---

[4] There is certainly no "physical impossibility" in complying with federal law and the TRA.

[5] 42 *U.S.C.A.* § 1401 has been repealed. In its place, 42 *U.S.C.A.* § 1437 refers to the same objective of assisting the states "to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings in low-income families."

an obstacle to the accomplishment of the federal law; it furthers its purposes. As the court said in *Pohlman v. Metropolitan Trailer Park, Inc.*, 126 *N.J.Super.* 114, 118, 312 *A.*2d 888 (Ch.Div. 1973), the "primary concern" of the Legislature in enacting the TRA "was the protection of those tenants who report such matters as housing and health code violations...."

> The governmental agencies charged with the enforcement of those regulations cannot effectively enforce them and take steps to eliminate violations thereof unless they learn of them, either through their own inspections or through information furnished by others. Complaints made by tenants of buildings which fail to conform to the regulations obviously are and should be the prime source of the agencies' information.

[*State v. Field*, 107 *N.J.Super.* 107, 111, 257 *A.*2d 127 (App.Div.1969).] [6]

The same point was made in *Scott, supra*, where we held that permitting an abatement of rent in public housing due to a breach of the implied warranty of habitability was not preempted by federal law. We stated:

> The housing authority as a landlord can claim no exemption from the obligation to furnish habitable accommodations for its tenants. No federal regulation has been called to our attention which would prevent reducing a tenant's rent when he has been deprived of facilities or services to which he is entitled and which are included in the established rent. Nor do we conceive that this judicial remedy infringes upon a domain fully occupied by legislative branches of government. The remedy of rent abatement has been held to apply to public housing in other jurisdictions.

[*Scott, supra*, 137 *N.J.Super.* at 116–17, 348 *A.*2d 195 (citations omitted).]

*Scott* stands in contrast to *Taylor, supra*, 171 *N.J.* at 595, 796 *A.*2d 193, holding that state law permitting a public housing authority to designate attorneys' fees and late charges as additional rent in a summary dispossess proceeding was preempted by federal law limiting the amount of rent payable by tenants in

---

[6] *Field* involved an appeal by a landlord of his disorderly persons conviction under former *N.J.S.A.* 2A:170–92.1, which made it an offense to threaten or take reprisals against a tenant who reported or complained of "the existence or belief of the existence of any health or building code violation...." That statute was repealed when the TRA was enacted. *See N.J.S.A.* 2A:42–10.10, creating a civil remedy for an aggrieved tenant.

public housing. In *Taylor,* the state law presented an actual conflict with the federal law. *Id.* at 593, 796 *A.2d* 193.[7]

In the present case, the trial judge determined that the eviction was retaliatory, a finding which, as we have noted, was supported by the evidence. Because of our conclusion that the TRA is not preempted by federal law, the judgment of eviction must be set aside and judgment entered for defendants. *N.J.S.A.* 2A:42–10.11.

Reversed and remanded with directions to enter judgment for defendants.

---

[7] *Taylor* did not cite *Scott,* suggesting to us that the Court did not view *Scott* as inconsistent with its holding.