**AUSTIN APARTMENT ASSOCIATION,**
Plaintiff,

v.

**CITY OF AUSTIN, Defendant.**

Case No. A–14–CA–1146–SS.

United States District Court,
W.D. Texas,
Austin Division.

Signed Feb. 27, 2015.

Craig T. Enoch, Melissa Anne Lorber, Shelby O'Brien, Enoch Kever PLLC, Austin, TX, for Plaintiff.

Meitra Farhadi, Assistant City Attorney, Patricia L. Link, City of Austin Law Department, Austin, TX, for Defendant.

Fred Fuchs, Nelson H. Mock, Kelli Howard, Texas RioGrande Legal Aid, Austin, TX, for Intervenors.

### ORDER

SAM SPARKS, District Judge.

BE IT REMEMBERED on the 26th day of January 2015, the Court held a hearing in the above-styled cause, and the parties appeared by and through counsel. Before the Court are Plaintiff Austin Apartment Association's Motion for Preliminary Injunction [# 4], Defendant City of Austin's Response [# 8] thereto, Intervenors Doris Landrum, Dimple Smith, Gloria Middleton, and Latorie Duncan's Response [# 7] thereto, Plaintiffs Trial Brief on Legal Authorities and Comparing Ordinance–Mandated and Free–Market Lease Terms [# 11], Defendant's Response [# 15] thereto, and Intervenors' Response [# 14] thereto. Having reviewed the documents, the arguments of the parties at hearing, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

### Background

On December 11, 2014, the City Council of the City of Austin, Texas, enacted Ordinance Number 20141211–050 (the Ordinance). The Ordinance amends the City's fair housing code to prohibit landlords from refusing to rent to prospective tenants on the basis of "source of income," which is defined to include "housing vouchers and other subsidies provided by government or non-governmental entities." Prelim. Inj. Hrg. Ex. P–8 (the Ordinance) at 2. Consequently, under the Ordinance, where a person is otherwise qualified to rent a property, the landlord may not reject that person's application solely because he or she wishes to pay a portion of the rent with a voucher obtained through the federal Housing Choice Voucher Program (HCVP or the Program), formerly known as Section 8.

Plaintiff Austin Apartment Association (the Association), a trade association whose members control rental properties serving over 192,000 households, claims the Ordinance is invalid and seeks a preliminary injunction against its enforcement pending resolution of this action. Specifically, the Association argues the Ordinance is preempted by Texas and federal law, impairs the obligation of contracts in violation of the Texas Constitution, and constitutes a regulatory taking and due process violation under the Texas and United States Constitutions. As set forth below, the Court finds the Association has failed to demonstrate a substantial likelihood of success on the merits of its claims, and therefore DENIES the motion for preliminary injunction.

### A. The Housing Choice Voucher Program

Congress created the Housing Choice Voucher Program to "aid[ ] low-income families in obtaining a decent place to live" and to "promot[e] economically mixed housing." 42 U.S.C. § 1437f(a). The Program is funded by the United States Department of Housing and Urban Development (HUD) and administered by state and local public housing authorities (PHAs) in accord with the regulations pro-

mulgated by HUD. Families (or individuals) who wish to receive housing vouchers must apply with their local PHA, which is responsible for screening prospective participants for federal eligibility, issuing vouchers, and contracting with landlords who lease to HCVP participants. *See* Prelim. Inj. Hrg. Ex. P–12 (HCVP Guidebook) at 1–12.

Once a family is approved by and receives a voucher from the PHA—a process that may take years, as demand for vouchers far outstrips supply and waiting lists are very long—the family is responsible for finding a landlord in the private rental market willing to lease to them. *See* 24 C.F.R. § 982.302(a). Federal law does not require landlords to accept housing vouchers, and landlords who do accept vouchers are not required to approve tenants merely because they are voucher holders. Rather, landlords who participate in the Program may screen prospective tenants and reject them if screening reveals red flags in terms of paying rent and utility bills, caring for rental housing, respecting neighbors, criminal activity, and the like. *See* 24 C.F.R. § 982.307(a) (discussing landlord's obligation to screen prospective tenants and factors properly considered in so doing).

Once the family has located a willing landlord and the family and landlord have negotiated the terms of the lease, the PHA must also approve the prospective tenancy. The landlord and family fill out and submit to the PHA a two-page Request for Tenancy Approval, which provides the PHA with basic information such as the address and size of the unit to be rented and the utilities and appliances provided by the landlord versus paid for by the tenant. *See* Prelim. Inj. Hrg. Ex. P–2 (Request for Tenancy Approval) at 1. The Request for Tenancy Approval also requires landlords who rent more than four units to disclose the rent charged for comparable units, so the PHA can ensure the rent charged to the voucher holder is comparable to that charged to unassisted tenants. *Id.* at 2.

The portion of the rent paid by the government is pegged to the PHA's schedule of "payment standards," dollar amounts based on the local fair market rent for apartments or houses of a certain size. HCVP Guidebook at 7–1. The PHA will never pay more than its fixed share, equal to the applicable payment standard less the dollar amount for which the voucher holder is responsible. *Id.* at 6–2. Typically, a family must pay thirty percent of its monthly adjusted income toward rent. *Id.* at 6–1; *see* 42 U.S.C. § 1437f(*o* )(2)(A). If a family wants to rent a unit which costs more than thirty percent of its monthly adjusted income plus the PHA's fixed share, the family may do so and pay the additional cost—but the amount paid by the family may never exceed forty percent of its monthly adjusted income. 42 U.S.C. § 1437f(*o* )(3); *see* HCVP Guidebook at 6–2. If the family's responsibility would exceed forty percent of its monthly adjusted income, the family may not rent that unit. HCVP Guidebook at 6–2.

If the PHA approves the tenancy, an inspection of the house or apartment to be leased to the family is scheduled. The inspection ensures the unit passes basic federal housing quality standards (HQS) geared toward ensuring tenant health and safety; for example, the property must have "a shower or bathtub with hot and cold running water," lockable exterior doors, "a safe heating system," permanently installed electrical outlets, and the like. *See* Prelim. Inj. Hrg. Ex. P–3 (HQS Checklist) at 5–7. All utilities must be turned on prior to the inspection. *Id.* at 9. According to the HQS Checklist, some of the most common reasons a unit fails inspection include broken smoke detectors,

missing or cracked electrical outlet covers, peeling paint, trip hazards from carpet or other permanent floor coverings, cracked windowpanes, and inoperable stove burners. *Id.* at 4. If a property fails inspection, the landlord is required to make any needed repairs and notify the PHA when the property is ready for re-inspection.

Once the unit has passed inspection, the landlord and the PHA must execute the HUD-prepared Housing Assistance Payments Contract. *See* Prelim. Inj. Hrg. Ex. P–4 (HAP Contract). Execution of the HAP Contract is required by HUD, and without an executed HAP Contract covering a particular family's tenancy, the PHA will not pay any rent to the landlord. *See id.* at 4 ("During the HAP contract term, the PHA will pay housing assistance payments to the owner[.]"). The landlord cannot modify or negotiate the HAP Contract; it "must be word-for-word in the form prescribed by HUD." *Id.* at 1. Further, the landlord must append a Tenancy Addendum to the landlord-tenant lease agreement, which controls in the event the two conflict. Prelim. Inj. Hrg. Ex. P–5 (Tenancy Addendum) at 1 § 1(b).

Under the HAP Contract, the PHA's responsibility to pay rent terminates automatically under a number of circumstances, including if the tenant terminates the lease, moves out of the unit, or is dropped from HCVP, or if the PHA determines there is not enough funding to continue the Program. *See* HAP Contract at 4 § 4(b)(1)-(6) (detailing situations in which the HAP Contract automatically terminates). The PHA has discretion to terminate payments if the family leasing the property breaks up, "if the PHA determines that the [property] does not provide adequate space ... because of an increase in family size or a change in family composition," or if the landlord violates the HAP Contract. *Id.* at 5 § 4(b)(7)-(9). Additionally, the HAP Contract governs the timing of payment of rent. Although the PHA "must pay housing assistance payments promptly when due," it will only be obligated to pay late fees for tardy payments if (1) charging late fees is general practice in the community, (2) charging late fees is the landlord's general practice, and (3) the landlord also charges the leasing family late fees. *Id.* at 5 § 7(a). Additionally, the PHA is not required to pay late fees, even where those three conditions are met, "if HUD determines that late payment by the PHA is due to factors beyond the PHA's control." *Id.* at 5 § 7(a)(3). Late payment of rent by the PHA is not a violation of the lease, and the landlord cannot terminate a tenancy because the PHA fails to pay its share. *Id.* at 9 § 5(d).

## B. Procedural History

On December 12, 2014, the Association filed suit in the 345th Judicial District Court of Travis County, Texas, seeking a declaration the Ordinance is invalid, a temporary restraining order, and preliminary and permanent injunctive relief. *See* Notice Removal [# 1–3] at 2 (Orig. Pet.). The City removed to this Court on December 31, 2014, invoking federal question jurisdiction. *Id.* [# 1] ¶ 1. Intervenors Latorie Duncan, Doris Landrum, Gloria Middleton, and Dimple Smith, all current HCVP voucher holders, filed a Plea in Intervention prior to removal and then a Motion to Intervene in this Court, seeking to intervene in support of the City. *See* Mot. Intervene [# 12]. The Court granted the motion on January 23, 2015. *See* Order of Jan. 23, 2015[# 18].

The Association filed the instant "Emergency Motion for Temporary Restraining Order [TRO] and, Thereafter, Motion for Preliminary Injunction" [# 4] on January 5, 2015. Following hearing on the motion, the Court granted the TRO and held the

motion for preliminary injunction in abeyance pending further development of the record and a second hearing. *See* Order of Jan. 6, 2015[# 10]. During the second hearing, which took place on January 26, 2015, the Court heard testimony from witnesses, received exhibits, and entertained argument on the motion.

### Analysis

### I. Legal Standard

■ A party seeking a preliminary injunction must satisfy each of four criteria: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not granted, (3) the substantial injury outweighs the threatened harm to the party against whom the injunction is sought, and (4) granting the injunction will not disserve the public interest. *Planned Parenthood Ass'n of Hidalgo Cnty., Tex., Inc. v. Suehs,* 692 F.3d 343, 348 (5th Cir.2012). " '[A] preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements.' " *Id.* (quoting *Tex. Med. Providers Performing Abortion Servs. v. Lakey,* 667 F.3d 570, 574 (5th Cir.2012)).

### II. Application

The Association argues the Ordinance is invalid for four reasons: first, it is preempted by state law; second, it is preempted by the federal Fair Housing Act; third, it unconstitutionally burdens the freedom to contract guaranteed by Article 1, § 16 of the Texas Constitution, which prohibits laws impairing the obligation of contracts; and fourth, it constitutes a regulatory taking and due process violation under both the Texas and United States Constitutions. The Association fails to demonstrate a substantial likelihood of success on the merits under any of its theories.

### A. State Preemption

■ The Association first argues the Ordinance is preempted by Texas law because it is not "substantially equivalent" to federal law, as required by § 214.903 of the Texas Local Government Code Section 214.903 provides:

(a) The governing body of a municipality may adopt fair housing ordinances that provide fair housing rights, compliance duties, and remedies that are substantially equivalent to those granted under federal law. Enforcement procedures and remedies in fair housing ordinances may vary from state or federal fair housing law.

(b) Fair housing ordinances that were in existence on January 1, 1991, and are more restrictive than federal fair housing law shall remain in effect.

TEX. LOCAL GOV'T CODE § 214.903. In the Association's view, § 214.903 preempts the Ordinance because the Ordinance "attempts to add a new protected class" that is different from those protected under the federal Fair Housing Act. Mot. Prelim. Inj. [# 4] at 6–7. The Court is unpersuaded.

■ Home-rule cities, like the City of Austin, "have broad discretionary powers" to enact their own ordinances, "provided that no ordinance 'shall contain any provision inconsistent with the Constitution of the State, or [with] the general laws enacted by the Legislature of this State.' " *Dall. Merch.'s & Concessionaire's Ass'n v. City of Dall.,* 852 S.W.2d 489, 490 (Tex. 1993) (quoting TEX. CONST. art. XI, § 5). Home-rule cities "possess the full power of self-government and look to the Legislature not for grants of power, but only for limitations on their power." *Id.* at 490–91 (citing *MJR's Fare v. City of Dall.,* 792 S.W.2d 569, 573 (Tex.App.-Dallas 1990, writ denied)). A home-rule city ordinance

is unenforceable to the extent it conflicts with a state statute. *Id.* at 491 (citing *City of Brookside Vill. v. Comeau,* 633 S.W.2d 790, 796 (Tex.1982)). However, a state statute and a home-rule city ordinance " 'will not be held repugnant to each other if any other reasonable construction leaving both in effect can be reached.' " *Id.* (quoting *City of Beaumont v. Fall,* 116 Tex. 314, 291 S.W. 202, 206 (1927)). Consequently, if the Texas legislature decides to preempt a subject normally within a home-rule city's broad powers, " 'it must do so with unmistakable clarity.' " *S. Crushed Concrete, LLC v. City of Hous.,* 398 S.W.3d 676, 678 (Tex.2013) (quoting *In re Sanchez,* 81 S.W.3d 794, 796 (Tex.2002)).

The Court finds the Association has failed to demonstrate a likelihood of success on the merits of its state preemption claim, as nothing in the record suggests § 214.903 preempts the Ordinance with "unmistakable clarity." The Association, without attempting to define "substantially equivalent," asserts the Ordinance is not substantially equivalent to the federal Fair Housing Act simply because the federal Fair Housing Act does not include source of income as a protected class. The Association cites no authority in support of that bold proposition, however, and the Court declines to embrace it. Construing § 214.903 as the Association urges would mean the City has long been violating the statute, as the City's fair housing code protects a number of classes of persons not protected by the federal Fair Housing Act. "Substantially," moreover, is defined by the Oxford English Dictionary as "[i]n all essential characters or features[.]" [1] It seems to the Court the salient "essential features" of the federal Fair Housing Act are the classes of persons it protects. The

Ordinance, in protecting from discrimination all of the classes protected under federal law and then some, exhibits the essential features of federal fair housing law. *Cf.* 24 C.F.R. § 115.204(h) (stating, in context of making substantial equivalency determination under federal law, if a local law "is different from the [Fair Housing] Act in a way that does not diminish coverage of the Act, including ... the protection of additional prohibited bases, then the ... local law may still be found substantially equivalent.").

That being said, the Court notes it is unsure what to make of the City's argument on this point. The City claims "substantially equivalent" is a term of art in fair housing law, referring to HUD's federal statutory authority to "certify" a local (or state) PHA, which requires HUD to determine whether the local (or state) law the PHA administers is "substantially equivalent" to the federal Fair Housing Act. *See* 42 U.S.C. § 3610(f)(3) (explaining HUD may certify an agency if the fair housing law it administers is substantially equivalent to federal law). Austin's PHA is certified by HUD; the City therefore concludes "unless and until HUD revokes the City's substantial equivalency certification, there is no violation of [§ 214.903]." Def.'s Resp. Mot. Prelim. Inj. [# 8] at 6.

 To the extent the City is claiming "substantially equivalent" as used in § 214.903(a) should be read coextensively with federal law, two unaddressed problems arise. First, that argument inserts the phrase "as determined by HUD" into § 214.903(a): "The governing body of a municipality may adopt fair housing ordinances ... that are substantially equivalent[, *as determined by HUD,*] to those granted under federal law." Courts are

---

**1.** *Substantially, adv.,* OED ONLINE, http://www.oed.com/view/Entry/193055?redirected

From=substantially&.

generally not free to read into statutes language that is not there. *See, e.g., Lamie v. U.S. Trustee*, 540 U.S. 526, 538, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004). Second, there appears to be a material difference between the federal and Texas statutes in employing the concept of substantial equivalency. Under federal law, HUD may certify a particular local agency only if (1) the rights the agency protects, (2) the procedures the agency follows, (3) the remedies available to the agency, and (4) the availability of judicial review of the agency's actions under the state or municipal fair housing law are all substantially equivalent to those created by and under the federal Fair Housing Act. 42 U.S.C. § 3610(f)(3)(A). Under § 214.903, however, "[e]nforcement procedures and remedies ... may vary from ... federal fair housing law." Tex. Local Gov't Code § 214.903(a). It is not entirely clear to the Court whether or how the variance permitted by § 214.903 squares with the federal concept of substantial equivalency since, in order to certify a local agency, the federal statute requires the procedures followed by and remedies available to the local agency be substantially equivalent to federal fair housing law. Further, even if the Court accepted the City's argument § 214.903 could not be violated unless HUD revoked the City's substantially-equivalent status, the City conceded at hearing there was no evidence HUD had reviewed the Ordinance and made that determination.

The burden of demonstrating a substantial likelihood of success on the merits, however, belongs to the Association, not to the City. On the present record, the Court concludes the Association has not carried that burden on the question whether the Ordinance is preempted by § 214.903.

## B. Federal Preemption

■ The Association next argues the Ordinance is preempted by the federal Fair Housing Act. Specifically, the Association claims because the Ordinance makes participation in HCVP mandatory under certain circumstances, it is preempted by the Act, which makes participation in HCVP voluntary. *See* 42 U.S.C. § 1437f(d)(1)(A) ("[T]he selection of tenants shall be the function of the owner."). The Court disagrees with the Association.

■ In determining whether federal law preempts state law, Congressional intent is the paramount consideration. *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987). Preemption may manifest in several different ways. First, Congress may expressly state a federal law preempts state law (express preemption). *Id.* Second, Congress's preemptive intent may be inferred where the federal scheme is so comprehensive it "occupies the field," leaving no room for supplementary state law (implied preemption). *Id.* at 280–81, 107 S.Ct. 683. Finally, and most relevant for present purposes, federal law may preempt state law to the extent the two actually conflict (conflict preemption), either because "compliance with both federal and state regulations is a physical impossibility," or because the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 281, 107 S.Ct. 683 (internal quotes omitted).

The Association argues conflict preemption applies, and specifically that the Ordinance "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See* Pl.'s Trial Brief [# 11] at 3. According to the Association, "[t]he voluntary nature of the [Program] lies at the heart of the federal law," as evidenced by Congress's two previous experiments with "mandat-

ing property owner participation": the "take one, take all" provision, which prohibited a landlord from declining to rent to a voucher holder if the landlord had done so in the past, and the "endless lease" provision, which prohibited landlords from refusing to renew voucher holders' leases at the expiration of the initial lease term. *See id.; see also* Pub.L. No. 105–276, §§ 549, 554, 112 Stat. 2461 (1996) (repealing "take one, take all" and "endless lease" provisions). The Association notes both provisions were repealed "because of their chilling effect" on landlords' willingness to participate in the program, given its "burdensome requirements." *Id.* (citing S. REP. No. 104–195, at 31–32 (1995)).

To date, the Association's argument has been rejected by every court which has confronted it. *See Bourbeau v. Jonathan Woodner Co.,* 549 F.Supp.2d 78, 88–89 (D.D.C.2008) (finding prohibiting discrimination against voucher holders will "advance rather than denigrate" Congress's objectives); *Montgomery Cnty. v. Glenmont Hills Assocs. Privacy World,* 402 Md. 250, 936 A.2d 325, 336 (2007) ("There is nothing in any of the relevant Federal statutes even to indicate, much less establish, that voluntary participation by landlords was an important Congressional objective. The only declared objective is to assist State and local governments in expanding affordable housing for low-income families...."); *Franklin Tower One, L.L.C. v. N.M.,* 157 N.J. 602, 725 A.2d 1104, 1113 (1999) ("[T]he voluntary nature of the Section 8 program is not at the heart of the federal scheme."); *Comm'n on Human Rights & Opportunities v. Sulli-*

*van Assocs.,* 250 Conn. 763, 739 A.2d 238, 246 (1999) ("Requiring landlords to extend rental opportunities to otherwise eligible section 8 recipients ... is not an obstacle to the congressional agenda but serves instead to advance its remedial purpose."); *Attorney General v. Brown,* 400 Mass. 826, 511 N.E.2d 1103, 1106 (1987) (reasoning helping low-income families obtain decent housing, not voluntary landlord participation, is at the heart of the federal scheme).

The Court can see no reason to swim against the current. The undersigned is of the. opinion Congress's decision to repeal the "take one, take all" and "endless lease" provisions provides no support for a conflict preemption argument. The provisions in question were repealed in order to encourage landlords to participate in the voucher program such that more housing would be available to voucher holders, not to protect landlords from being required to rent to voucher holders.[2] *See Franklin Tower One,* 725 A.2d at 1113 (concluding repeal of "take one, take all" supports conclusion Congress's goal "has always been to assist in providing housing to low-income families"). Further, the Court agrees with the City and the decisions cited above that the purposes and objectives of HCVP are "to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families," not to protect landlords' rights. 42 U.S.C. § 1437(a)(1)(A) (declaring Congressional policy). The Ordinance clearly serves those purposes and objectives by increasing the number of houses and apartments available to voucher hold-

---

**2.** The Court further notes the inference HCVP is voluntary comes from solely from the previously quoted subsection of the statute which states "[c]ontracts to make assistance payments entered into by a[PHA] with a [landlord] shall provide that ... the selection of

tenants shall be the function of the owner[.]" 42 U.S.C. § 1437f(d)(1)(A). Nothing in that provision implies a landlord should have the right to discriminate against a voucher holder simply because he or she is a voucher holder. *Franklin Tower One,* 725 A.2d at 1113.

ers, and in doing so, "advance[s] rather than denigrate[s]" the Program's objectives. *Bourbeau*, 549 F.Supp.2d at 88 (citing *Glenmont Hills*, 936 A.2d at 336)..

In support of its contrary position, the Association cites *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293 (2d Cir.1998), and *Knapp v. Eagle Property Management Corp.*, 54 F.3d 1272 (2d Cir.1995). Neither case directly addresses federal preemption. The question before the *Salute* court was whether the provision of the Fair Housing Act that requires landlords to make "reasonable accommodations" for disabled tenants required landlords to accept disabled tenants' housing vouchers. *Salute*, 136 F.3d at 301. In holding it did not, the *Salute* court did discuss the "burdensome requirements" of the voucher program, but the underpinning of its decision was that the disabled plaintiffs, in asking the landlords to accommodate them by accepting their vouchers, sought "to remedy economic discrimination of a kind that is practiced without regard to handicap." *Id.* at 302. Consequently, the *Salute* panel reasoned, it was not necessary to require landlords to accept disabled persons' housing vouchers "to afford handicapped persons equal opportunity to use and enjoy a dwelling." *Id.* (internal quotes omitted).

Similarly, the *Knapp* court did not confront a preemption question. The issue before the panel was whether a Wisconsin statute that prevented discrimination in housing based upon "lawful source of income" encompassed housing vouchers. *Knapp*, 54 F.3d at 1282. In holding housing vouchers were outside the statute's purview, the court noted the contrary result would mean any landlord who did not accept vouchers could be liable for discrimination, and observed: "It seems questionable ... to allow a state to make a voluntary federal program mandatory." *Id.*

Even in so observing, however, the *Knapp* court included a qualifying citation to *Attorney General v. Brown*, which found the Fair Housing Act did not preempt a state source-of-income statute-the only reported decision discussing the question as of 1995, the year *Knapp* was decided. *Id.* (citing 511 N.E.2d at 1106). The Court finds the decisions from those courts directly presented with the federal preemption question far more persuasive than dicta from those which were not.

■■■ Finally, the Court notes the HUD regulations implementing HCVP specifically provide the federal statutes creating it are not intended "to pre-empt operation of State and local laws that prohibit discrimination against a Section 8 voucher-holder because of status as a Section 8 voucher-holder." 24 C.F.R. § 982.53(d). The Court owes deference to HUD's interpretation of the laws it administers. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer[.]").

Given all of the above, the Court concludes the Association has failed to show a substantial likelihood of success on the merits of its federal preemption claim.

### C. Texas Constitution

■■■ The Association next argues the Ordinance violates Article I, § 16 of the Texas Constitution, which prohibits any law impairing the obligation of contracts. The Association contends an individual may not be forced to contract against his will under Article I, § 16; thus, in the Association's view, by prohibiting landlords from rejecting applicants because they wish to pay with housing vouchers, the Ordinance unconstitutionally forces unwill-

ing landlords to sign the HAP Contract. *See* Mot. Prelim. Inj. [# 4] at 8; Pl.'s Trial Brief [# 11] at 4–5.

The Association misapprehends the nature of the constitutional protection. Article I, § 16 applies "only where parties have entered into a contract and *thereafter* a statute is passed that unlawfully impairs their contractual obligations." *Cessna Fin. Corp. v. Morrison,* 667 S.W.2d 580, 584 (Tex.App.-Houston [1st Dist.] 1984, no writ); *see also Travelers' Ins. Co. v. Marshall,* 124 Tex. 45, 76 S.W.2d 1007, 1011 (1934) ("[S]ection 16 of article 1 of the constitution of Texas.... protects all obligations of contracts from destruction or impairment by *subsequent* legislation.") (emphasis added); *Henderson v. Love,* 181 S.W.3d 810, 814 (Tex.App.-Texarkana 2005, no pet.) ("The 'obligation of a contract,' for purposes of the constitutional prohibition of impairment of contractual obligations, is defined as the law which binds the parties to perform their agreement. The laws in effect *at the time a contract is executed* are considered part of that contract.") (emphasis added) (internal citations omitted); *City of Brownsville v. Pub. Util. Comm'n of Tex.,* 616 S.W.2d 402, 410 (Tex.App.-Texarkana 1981, writ ref'd n.r.e.) ("The obligations of a contract are not impaired ... by a statute in effect when the contract was made."); *Barton v. Wichita River Oil Co.,* 187 S.W. 1043, 1045 (Tex.App.-Fort Worth 1916, writ ref'd) ("The provision of the Constitution which declares that no state shall pass any law impairing the obligation of contracts does not apply to a law enacted prior to the making of the contract ... but only to a statute of a state enacted after the making of the contract."). Because the Association has not alleged the obligations of any existing contract are impaired by the Ordinance, Article I, § 16 does not apply.

Urging a different conclusion, the Association cites to *St. Louis Southwestern Railway Co. of Texas v. Griffin,* 106 Tex. 477, 171 S.W. 703 (1914). *Griffin* provides no support for the Association's argument. In *Griffin,* a railway worker (Griffin) sued his employer under what was then known as the "Blacklisting Law." *Id.* at 703. The Blacklisting Law required an employer, after firing an employee, give the employee a "true statement" explaining the reasons for his termination. *Id.* Considering the constitutionality of the Blacklisting Law, the court noted when Griffin entered the railway's employ, Griffin had the right to leave his job without cause or notice, and the railway had the right to fire Griffin without cause or notice. *Id.* at 704. The court then observed the Blacklisting Law, by requiring the railway give Griffin a statement of the "true cause" of his termination, denied the railway its right to fire Griffin without cause, because a requirement the employer give a "true cause" for firing an employee necessarily implies a "true cause" exists. *Id.* The court concluded:

> The value of the contract to each party consisted largely in the mutual right to dissolve the relation of master and servant at will. The destruction of that right in the corporation was a violation of its liberty of contract and a denial of the equal protection of the law[ ] in violation of ... the fourteenth amendment.

*Id.* The court was concerned with the effect of the law on the railway's contractual right to terminate Griffin without cause. The question before the *Griffin* court thus had nothing to do with whether a law should be held unconstitutional because it "compelled the entering of contracts," as the Association claims. Pl.'s Trial Brief [# 11] at 5.

Article I, § 16 of the Texas Constitution does not apply on these facts. The Associ-

ation has therefore failed to demonstrate a substantial likelihood of success on the merits of its obligation-of-contracts claim.

### D. "Liberty of Contract"

■ In making its obligation-of-contracts argument, the Association heavily relies on dicta from the *Griffin* court: "The liberty to make contracts includes the corresponding right to refuse to accept a contract[.]" *Griffin*, 171 S.W. at 704. An argument the Ordinance is unconstitutional because it will require property owners to sign a contract, however, sounds in substantive due process, not in impairment of the obligation of contracts. *See, e.g., Andrada v. City of San Antonio*, 555 S.W.2d 488, 491 (Tex.App.-San Antonio 1977, writ dism'd) ("[L]iberty of contract is generally said to be a part of that 'liberty' which is protected by due process clauses."). The Court thus considers the argument under a due process rubric.

The Association's reluctance to locate its claim in due process is unsurprising, since in the federal context "[t]he traditional view ... is that the [Supreme] Court exceeded its legitimate judicial role by reading the right of 'liberty of contract' into the Fourteenth Amendment's Due Process Clause, despite the absence of textual support for this right." David E. Bernstein, *Lochner's Legacy's Legacy*, 82 TEX. L.REV. 1, 3–4 (2003). Since the era of *Lochner v. New York*[3] drew to a close in the late 1930s, the Supreme Court has reviewed economic legislation affecting liberty of contract with great deference to the legislature. *See, e.g., Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) ("It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on

one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way."); *Ferguson v. Skrupa*, 372 U.S. 726, 730, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963) ("We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws."); *see also Chi. B. & Q.R. Co. v. McGuire*, 219 U.S. 549, 567, 31 S.Ct. 259, 55 L.Ed. 328 (1911) ("The Constitution does not speak of freedom of contract.... There is no absolute freedom to do as one wills or to contract as one chooses.").

A federal "liberty of contract" substantive due process claim is thus a veritable non-starter, and in any event, the Association has made no allegation the City acted in an arbitrary or irrational way by passing the Ordinance. Moreover, the Ordinance advances an obviously legitimate government interest: ensuring low-income persons—many of whom are racial minorities, children, disabled, or elderly—have access to affordable housing (and thus to better schools and safer neighborhoods) throughout the City of Austin. *See* Prelim. Inj. Mot. Hrg. Ex. D-1 (City Council Resolution) at 2–3 (noting 91% of rental units in Travis County do not accept vouchers and high occupancy rates exacerbate the difficulties voucher holders face in finding housing); *id.* Ex. D-4 (Demographics Rep.) (indicating among heads-of-household who hold vouchers in Austin, 43% are disabled, 84% are female, and 16% are elderly, and stating 50.8% of HCVP beneficiaries are children); *see also Blue Cross & Blue Shield Mut. v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 333 (6th Cir.1997) ("[F]reedom of contract entails the freedom not to contract, ... *except as*

**3.** 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905).

*restricted by* antitrust, *antidiscrimination,* and other statutes." (emphasis added)).

A Texas liberty-of-contract due process claim might present a slightly different question. Texas courts have been inconsistent in describing the scope of substantive due process under the Texas Constitution as compared to the federal Constitution, sometimes stating the Texas Constitution provides "an identical guarantee" and sometimes "attempt[ing] to articulate [Texas'] own independent due [process] standard, which some courts have characterized as more rigorous than the federal standard." *Tex. Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 525 (Tex.1995). The "more rigorous" standard cited is a 1957 formulation:

> The line where the police power of the state encounters the barrier of substantive due process is not susceptible of exact definition. As a general rule the power is commensurate with, but does not exceed, the duty to provide for the real needs of the people in their health, safety, comfort and convenience as consistently as may be with private property rights.... A large discretion is necessarily vested in the Legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests. If there is room for a fair difference of opinion as to the necessity and reasonableness of a legislative enactment on a subject which lies within the domain of the police power, the courts will not hold it void.

*State v. Richards,* 157 Tex. 166, 301 S.W.2d 597, 602 (1957) (emphasis added). One Texas court, in dicta, agreed "in general" with the proposition that Article I, § 19 "guarantees broader due process protection for substantive economic rights than does the United States Constitution."

*Yorko v. State,* 681 S.W.2d 633, 636 (Tex. App.-Houston [14th Dist.] 1984), *aff'd,* 690 S.W.2d 260 (Tex.Crim.App.1985). "More frequently, however," Texas courts have "relied on both state and federal authorities in discussing" Article I, § 19, and a "substantial number of Texas cases" have held or implied that the federal and Texas clauses are "identical," in contrast with only a "handful" of opinions suggesting the Texas clause has independent meaning. *Lucas v. United States,* 757 S.W.2d 687, 712–13 (Tex.1988) (collecting cases).

Whichever standard is applied, however, the Court finds the Association has failed to demonstrate a substantial likelihood of success on the merits. There is, at the very least, "room for a fair difference of opinion" as to the necessity and reasonableness of the Ordinance in providing for "the real needs of the people ... as consistently as may be with private property rights." The record shows HCVP participants suffer serious discrimination in the Austin private housing market and, to the extent they are able to find housing, are concentrated in the poorest areas of the city. *See* City Council Resolution at 3 (stating 91% of Austin landlords do not accept vouchers); Prelim. Inj. Hrg. Ex. D–3 (indicating concentration of voucher holders by zip code); *id.* Ex. D–5 (explaining the units in Austin available to voucher holders "are located in low-opportunity areas and lack high-performing schools, sustainable employment, and low-crime neighborhoods"). The City determined the public interest required discrimination against voucher holders be prohibited, as have dozens of states and municipalities around the nation. *See* POVERTY & RACE RESEARCH ACTION COUNCIL, APPENDIX B: STATE, LOCAL, & FEDERAL LAWS BARRING SOURCE–OF–INCOME DISCRIMINATION 1–2 (2014) (listing state and local source-

of-income laws)[4]; *see also, e.g., Godinez v. Sullivan–Lackey,* 352 Ill.App.3d 87, 287 Ill.Dec. 178, 815 N.E.2d 822, 824 (2004) (finding refusal to rent to voucher holder a violation of source-of-income anti-discrimination provision in Chicago's Fair Housing Ordinance); *Glenmont Hills,* 936 A.2d at 327 (same, as to Montgomery County, Maryland housing ordinance); *Timkovsky v. 56 Bennett, LLC,* 23 Misc.3d 997, 881 N.Y.S.2d 823, 829 (N.Y.App.Div.2009) (same, as to New York City housing ordinance).

The counterargument, of course, is that the Ordinance goes too far in attempting to accomplish its goal, since at least some landlords who do not wish to do so will be required to sign the HAP Contract and subject themselves to the regulations governing the Program. Orig. Pet. ¶ 31. While the parties dispute the precise extent of the differences between the terms of a tenancy governed solely by the Association's standard lease and one governed by the standard lease plus the HAP Contract and Tenancy Addendum, it is clear the latter requires a landlord to shoulder different burdens and accept different risks than the former. As previously explained, the PHA's responsibility for making rent payments terminates automatically under certain circumstances; the PHA has discretion to stop making payments under certain circumstances; the PHA is only obligated to pay late fees for tardy payments under certain circumstances; units rented to Program participants must be inspected, and the PHA will not begin paying rent on a unit until it passes inspection; and the landlord will not receive the entirety of the first month's rent until thirty to forty-five days after the unit passes inspection.[5]

The Court agrees these regulations place some burden on the landlords subject to them, and acknowledges the potential for lost revenue while a PHA inspection is scheduled and a unit sits vacant. It is likely there are different, less burdensome ways the City could entice property owners to participate in the Program. It is also conceivable an individual landlord could experience an unusually significant financial burden flowing from participation in the Program so great it could support an as-applied constitutional claim warranting an exception from participation.[6] In the context of a facial due process challenge, however, this Court cannot say there is no room for a "fair difference of opinion" regarding the need for the Ordinance and the weight of the burdens it imposes, and will not substitute its judgment for the City Council's.

Further, courts that have considered versions of the so-called administrative-burdens defense have rejected it. *See Bourbeau,* 549 F.Supp.2d. at 87; *Glenmont Hills,* 936 A.2d at 339–40. Landlords remain free to reject voucher holders provided they do so on other legitimate, nondiscriminatory grounds, and are not required to reduce the rent they charge even if that means their units are too expensive for voucher holders to rent. Further, testimony at hearing indicated the housing quality standards a unit must satisfy to pass the PHA inspection are no more onerous than those already imposed by the Austin City Code. These burdens are not

---

**4.** *Available at* http://www.prrac.org/pdf7 AppendixB-Feb2010.pdf.

**5.** *See* Background, subsection A, *supra.*

**6.** *Cf.* Krista Sterken, *A Different Type of Housing Crisis: Allocating Costs Fairly and Encouraging Landlord Participation in Section 8,* 43 Colum. J.L. & Soc. Probs. 215, 227–30 (2009) (advocating for a "narrow" equitable exception to landlord participation applicable under "unusual circumstances").

so severe as to constitute a violation of due process.

The Court concludes, to the extent the Association raised a "liberty of contract" due process claim, it has failed to demonstrate a substantial likelihood of success on the merits.

### E. Regulatory Taking

 Finally, the Association rather weakly asserts the Ordinance is so burdensome it amounts to a regulatory taking under the Texas and United States Constitutions and a violation of substantive due process. *See* U.S. CONST. amends. V, XIV; TEX. CONST. art. I, § 17(a). Where a plaintiff alleges a takings claim and a substantive due process claim together, courts must determine the extent to which the due process claim "rests on protections that are also afforded by the Takings Clause" and analyze the claim accordingly. *John Corp. v. City of Hous.*, 214 F.3d 573, 583 (5th Cir.2000). Here, the Court finds, to the extent it is unaddressed by the Court's discussion in section II(D), *supra*, the Association's due process claim is subsumed within its takings claim. The petition contains very few allegations concerning due process, merely asserting the right to be free from a "substantial burden" that "deprives property owners of use of their property," *see* Orig. Pet. [# 1–3] ¶¶ 30–31; further, the Association fails to develop a due process theory in its briefing, *see* Pl.'s Trial Brief [# 11] at 6–7. The right to be free from a "burden" that "deprives property owners of use of their property" falls squarely within the ambit of the Takings Clause. *See Yee v. City of Escondido, Cal.*, 503 U.S. 519, 522–23, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (explaining the Takings Clause requires compensation where "the extent to which [the regulation] deprives the owner of the economic use of the property suggest[s] that the regulation

has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole"). It is therefore the Takings Clause, "not the more generalized notion of 'substantive due process,' [that] must be the guide for analyzing" the Association's claim. *John Corp.*, 214 F.3d at 582.

On to the analysis. The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth Amendment, directs that private property shall not "be taken for public use, without just compensation." U.S. CONST. amend. V; *Chi., B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 234, 17 S.Ct. 581, 41 L.Ed. 979 (1897). The Texas Constitution contains a similar mandate: "[n]o person's property shall be taken ... for or applied to public use without adequate compensation being made." TEX. CONST. art. I, § 17. Federal and Texas courts apply the same standards in evaluating takings claims. *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 477 (Tex.2012) ("We consider the federal and state takings claims together, as the analysis for both is complementary.").

██ Before addressing the merits of a takings claim, the Court must be convinced the claim is ripe, even if neither party has raised the issue. *Urban Developers, L.L.C v. City of Jackson, Miss.*, 468 F.3d 281, 292 (5th Cir.2006). Here, the Interveners raise the ripeness issue, arguing adjudication of the takings issue is premature and speculative because the Ordinance, on its face, does not require landlords to reduce the rents or security deposits they typically charge. While the Intervenors fail to further elaborate, their ripeness objection appears to be that because the Ordinance has yet to take effect, we cannot know whether any landlord will actually lose money due to operation of the Ordinance.

The Intervenors approach the problem incorrectly. To the extent the Intervenors

are pointing out the Association's challenge presents no concrete controversy concerning application of the Ordinance to *specific landlords,* the Court agrees. The Association *has* raised, however, a pre-enforcement facial challenge to the constitutionality of the Ordinance itself. Thus, " 'the only question before this court is whether the mere enactment of [the Ordinance] constitutes a taking,' " and the applicable test is whether the Ordinance " 'denies an owner economically viable use of his land.' " *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 493, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (some internal quotes omitted) (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 295–96, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981)).[7]

The Association argues the Ordinance does just that, but the Court is unpersuaded. Landlords remain free to rent their property to paying tenants. No landlord is required to lower the rent he or she charges for a unit because a voucher holder cannot afford to rent it. Property owners who accept HCVP tenants receive compensation for doing so in the form of rent payments from the government. Further, the Ordinance substantially advances an obviously legitimate government interest: ensuring low-income persons will have access to affordable housing throughout the City of Austin. *See Dolan v. City of Tigard,* 512 U.S. 374, 385, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) ("A land use regulation does not effect a taking if it substantially advances legitimate state interests and does not deny an owner economically viable use of his land." (internal quotes omitted)); *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 933–34 (Tex. 1998) (discussing substantial-advancement requirement).

The Court concludes the Association has failed to carry its burden to show a substantial likelihood of success on the merits of its takings claim.

### Conclusion

The Association has failed to demonstrate a substantial likelihood of success on the merits on any of its challenges to the Ordinance. The Court therefore need not consider the other preliminary injunction factors before denying the motion for injunctive relief.

Accordingly,

IT IS ORDERED that Plaintiff Austin Apartment Association's Motion for Preliminary Injunction [# 4] is DENIED.

---

7. The Intervenors cite *Pennell v. City of San Jose,* 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988), in support of their contrary position. *Pennell* is distinguishable. *Pennell* involved a rent-control ordinance requiring city officers to consider "hardship to the tenant" in deciding whether to approve certain rent increases. *Id.* at 10, 108 S.Ct. 849. Importantly, the ordinance also provided that in making the ultimate decision to approve or disapprove a rent increase, the officer "may" disapprove an increase because of tenant hardship. *Id.* Because there remained a material question, given the discretion afforded city officers, as to how the ordinance would ultimately be applied, the *Pennell* court found the case did not present a sufficiently concrete factual setting for adjudication of the takings claim. *Id.* Here, the Ordinance involves no such discretion: the City has not contested the fact it intends to apply the Ordinance such that all landlords subject to its strictures are prohibited from discriminating against voucher holders solely because they are voucher holders. " 'One does not have to await the consummation of threatened injury to obtain preventive relief.' " *Blanchette v. Conn. Gen. Ins. Corps.,* 419 U.S. 102, 143, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) (quoting *Pennsylvania v. West Virginia,* 262 U.S. 553, 593, 43 S.Ct. 658, 67 L.Ed. 1117 (1923)).